482 So.2d 640 (1984)
Ray and Annette ROWELL
v.
CARTER MOBILE HOMES, INC., et al.
No. CA 84 0834.
Court of Appeal of Louisiana, First Circuit.
July 6, 1984.
Rehearing Denied February 7, 1986.
Writ Granted March 31, 1986.
*641 S. Michael Cashio, Kenner, for Ray and Annette Rowell.
*642 William R. Brough, New Orleans, for Carter Mobile Home, Inc. and Commercial Union Insurance Co.
Richard D. McShan, Greenburg, for Calvin Cernich.
Mark C. Surprenant, New Orleans, for Tidwell Industries, Inc.
Daniel R. Atkinson, E. Clark Gaudin, Baton Rouge, for Louisiana National Bank of Baton Rouge.
Ken Ruhl, King of Prussia, Pa., for Northeastern Fire Insurance Co.
H.F. Foster, III, New Orleans, for Guaranty National Insurance Co.
J. Michael Cutshaw, Baton Rouge, amicus curiae.
Before LOTTINGER, COLE and CRAIN, JJ.
COLE, Judge.
This appeal involves a suit for personal injuries filed by plaintiffs, Ray and Annette Rowell. Judgment was rendered in favor of the plaintiffs and against defendant, Louisiana National Bank of Baton Rouge (LNB). LNB has appealed.

FACTS
Due to a default in loan payments, LNB initiated foreclosure proceedings in August of 1981 on a 1977 Tidwell Dorado mobile home upon which it held a chattel mortgage. LNB eventually acquired title to this mobile home at sheriff's sale.[1] It then requested that Carter Mobile Homes, Inc. (Carter), the original vendor, pick up the mobile home and take it to Carter's lot in Greensburg for resale. This was the customary arrangement between LNB and Carter with respect to mobile homes repossessed by LNB. It was also part of their customary arrangement for Carter to attend to the performance of any repairs which might be necessary on mobile homes which had been repossessed by LNB. LNB relied entirely on Carter's expertise in this area.
In November of 1981, plaintiffs were interested in purchasing a used mobile home. They visited the Carter lot in Greensburg for this purpose, but failed to find a suitable home on this occasion. On a second occasion Mrs. Rowell returned alone and was shown the 1977 Tidwell mobile home repossessed by LNB. She was not informed of LNB's ownership of this mobile home.
Mrs. Rowell expressed interest in this mobile home, but noted certain areas of the floor were in very poor condition and badly in need of repair. The Carter salesperson assisting Mrs. Rowell assured her this flooring would be repaired prior to sale.
Sometime thereafter this mobile home was repaired by and/or under the supervision of Mr. Calvin Cernich, an employee of Carter.[2] These repairs were authorized *643 by LNB under its customary arrangement with Carter. There is no indication LNB was actually involved or gave any specific instructions as to what repairs were to be performed on this particular mobile home. Cernich testified he generally either received his instructions from Carter or exercised his own discretion as to what repairs were necessary on a particular mobile home. He had no independent recollection of the repairs performed on the mobile home purchased by plaintiffs. However, the invoice prepared by him for these repairs indicates flooring in the living room, kitchen and bathroom was replaced. The charge for these repairs was $1,105.00 for labor and $369.21 for parts, a total of $1,474.21.
On November 23, 1981, after completion of the repairs, Carter executed a bill of sale in Greensburg purportedly transferring title of this mobile home to plaintiffs for a cash price of $10,500.00. Plaintiffs gave Carter a $1,000.00 cash down payment and executed a promissory note made out to the order of bearer for the remaining balance. They also executed a chattel mortgage on the mobile home, which listed Carter as the mortgagee/seller.
Shortly after these papers were signed, Carter contacted LNB's collection manager, Mr. Philip Stanley, in Baton Rouge and informed him of the execution of these documents. Mr. Stanley then had a bill of sale drawn up in authentic form, dated November 23, 1981, transferring title of the mobile home from LNB to Carter for a stated consideration of $10,500.00, receipt of which was acknowledged. On November 29, 1981, Carter assigned to LNB both the chattel mortgage and promissory note executed by plaintiffs. On December 8, 1981, Carter made out a check to LNB for $1,000.00, representing the down payment made by plaintiffs.
Upon initially taking possession of the mobile home, plaintiffs noted nothing amiss with the floors, which appeared to have been satisfactorily repaired. However, within two weeks plaintiffs began noticing weak spots in the floor, especially in the living room area. Mrs. Rowell testified she called Carter regarding this problem on several occasions, but no one was ever sent out in response. On January 5, 1982, as Mr. Rowell entered through the front door of the mobile home his left leg went completely through the floor, causing him to fall in a straddled position and severely injure his back. The point at which Mr. Rowell fell was not one of the weak spots previously noticed by plaintiffs.

PROCEDURAL POSTURE
In addition to plaintiffs' original petition filed December 8, 1982, supplemental and amending petitions were filed. Carter and its insurers, Northeastern Fire Insurance Company of Pennsylvania, Commercial Union Insurance Company and Guaranty National Insurance Company; Tidwell Industries, Inc. (Tidwell), the original manufacturer of the mobile home; Calvin Cernich; and LNB were named as parties defendant in the composite pleadings. In addition to responding to the main demand, several of the defendants filed third party demands against other defendants, including one by LNB on February 24, 1983, naming Carter, Cernich and Tidwell as third party defendants. In their third party demand LNB sought judgment over and against these third party defendants for any amount for which it might be held liable to plaintiffs on the main demand.
Prior to trial plaintiffs settled with and released Tidwell, Carter and Carter's insurers, Commercial Union and Guaranty National. These defendants were dismissed from the main demand upon various motions. Plaintiffs had previously sought and were granted an order dismissing Northeastern Fire, without prejudice. In response LNB filed an amended answer claiming it was entitled to a reduction in any judgment rendered against it, commensurate *644 with the responsibility of the released defendants under the laws of indemnity, comparative negligence and/or contribution.
At trial of the matter on March 7, 1984, Carter, Commercial Union and Guaranty National, all of which had settled with plaintiffs and been dismissed, orally moved for a dismissal of LNB's third party claim against Carter. The dismissal of LNB's third party claim as to Carter was granted by the trial court over the objections of counsel for LNB. The trial then proceeded against the remaining defendants, Cernich and LNB. Following trial, the matter was taken under advisement and the trial court ultimately rendered judgment in favor of plaintiffs and against LNB. Judgment was awarded in the amount of $469,546.12, which was itemized as follows: past pain and suffering, $100,000; future pain and suffering, $100,000; past and future mental pain and suffering, $50,000; past loss wages, $24,169; future loss wages, $183,399.04; and, past medical expenses, $11,978.08. However, the trial court reduced recovery by 50% because of the prior release of Carter, which the trial court concluded was solidarily liable with LNB for plaintiffs' damages. LNB was cast also for one-half of the court costs. In addition, judgment was rendered dismissing plaintiffs' suit against Cernich as well as LNB's third party demands against Cernich.

ISSUES RAISED ON APPEAL
LNB has perfected a suspensive appeal from this judgment, alleging the trial court erred in holding it liable for plaintiffs' damages as a manufacturer or under any other legal theory, in dismissing plaintiffs' suit against Cernich, in the alternative, in dismissing its third party demands for judgment over against Carter and Cernich, and, in awarding an excessive amount of damages.

MERITS
The trial court rendered judgment against LNB under the theory it was a manufacturer of the mobile home purchased by plaintiffs and thus liable for any defects present therein. The court concluded the extensive floor repairs authorized by LNB had the legal effect of converting it into a manufacturer of this mobile home. We disagree with this conclusion.
There are cases holding one who extensively rebuilds, overhauls or modifies an existing object may be considered a manufacturer of that object and held liable as such. See Spillers v. Montgomery Ward & Company, Inc., 294 So.2d 803 (La.1974); Thomas v. W & W Clarklift, Inc., 444 So.2d 1300 (La.App.4th Cir.1984), writ denied, 448 So.2d 113 (La.1984); Capitol City Leasing Corp. v. Hill, 394 So.2d 1264 (La. App.1st Cir.1981), remanded on other grounds, 404 So.2d 935 (La.1981). However, these cases are inapplicable to the present situation since the plaintiffs' mobile home was clearly not extensively rebuilt, overhauled or modified in any manner. Other than the work done on the floors, no other major repairs were performed on it. Although a rather large portion of flooring was in fact replaced, we do not consider this work so extensive as to constitute the manufacture of a new object, particularly in view of the large number of various components involved in the manufacture of a mobile home. Further, LNB neither performed the repairs itself, labeled the product as its own or held itself out as the manufacturer of this mobile home. Thus, even if the repairs performed were considered extensive, LNB could not be considered the manufacturer of this mobile home, merely because it authorized the repairs.
A careful review of the situation and the transactions between the parties reveals the true nature of the relationship between LNB and Carter was that of undisclosed principal and mandatary. An agent or mandatary is defined as one who acts for or in the place of another by authority from the latter. La.Civ.Code art. 2985; Ward v. Pennington, 434 So.2d 1131 (La.App.1st Cir.1983), writ denied, 438 So. 2d 572 and 576 (La.1983). This definition describes clearly the situation existing *645 between LNB and Carter as regards the sale of the mobile home in question. It is undisputed this mobile home was placed on Carter's lot at LNB's request for the express purpose of allowing Carter to sell it for LNB. The testimony of Prentice Carter, the president of Carter, establishes Carter was acting in LNB's behalf and did not itself derive any direct benefit from the sale. Since Carter was acting in LNB's behalf and with LNB's full authorization in arranging the sale with plaintiffs, it must be considered LNB's mandatary for purposes of this transaction.
In the course of arranging the sale to plaintiffs, a Carter employee assured plaintiffs the flooring in the mobile home would be repaired prior to the sale. Since Carter had the authority under its customary arrangement with LNB to make any necessary repairs, as well as to sell the mobile home, it unquestionably had the authority to make this representation to plaintiffs. A principal is bound by its mandatary's authorized representations. La.Civ. Code art. 3021; Guillory v. Braswell Freight Lines, Inc., 256 So.2d 646 (La. App.2d Cir.1972), writ refused, 260 La. 1134, 258 So.2d 381 (1972). Therefore, LNB is legally bound for any fault of Carter as regards repairs to the mobile home, to the same extent as is Carter itself. Carter, per se, as a corporation, cannot itself be guilty of any actual fault. It cannot be a "real" tortfeasor. It only employs people whose acts or conduct become causative factors giving rise to plaintiff's injuries. Accordingly, we must determine whether Carter, as an employer, is chargeable with any fault which was the cause of plaintiff's injuries. We conclude it was.
Following the sale, Carter advised plaintiffs to inform it of any problems with the mobile home in order that they might be corrected. When plaintiffs began noticing weak spots in the floors, Mrs. Rowell telephoned Carter on several occasions regarding this problem. She testified Carter never sent anyone out to repair the floor.[3] If Carter had done so, an inspection would undoubtedly have revealed to a repairman the dangerous condition of the entryway floor, which could then have been repaired.
Having undertaken the repair of plaintiffs' mobile home, Carter had a duty to perform these repairs properly and to correct any problems arising from the negligent performance of this duty. Carter, through its unnamed employee(s), breached this duty by failing to investigate plaintiffs' complaints. The consequences which resulted should have been reasonably anticipated by Carter as one of the risks within the scope of its duty to plaintiffs.
We also conclude Cernich was guilty of fault which was chargeable to Carter, his employer, and which was a contributing cause of the plaintiff's injuries. A repairman owes a duty of reasonable care, inspection and workmanlike performance of repairs. Hunt v. Ford Motor Co., 341 So.2d 614, 619 (La.App.2d Cir.1977). This duty includes an obligation to warn of any unrepaired defects. Hunt, supra; Block v. Fitts, 274 So.2d 811, 814 (La.App.3d Cir. *646 1973). Further, a person not privy to the repair contract may recover in tort from the repairman if the accident causing his injuries was of the type the repairman reasonably should have anticipated might result from his negligence. Block, supra.
The trial court concluded the repairs on plaintiffs' mobile home were performed in a negligent manner. We agree. Plaintiffs began noticing weak spots in the floor within two weeks of the sale. In a deposition introduced by plaintiffs Mr. Randall Millet, an experienced mobile home repairman, expressed the opinion the joists and bracings which were in place at the time of Mr. Rowell's fall were inadequate to support the area of the floor where he fell. Mr. Millet also noted the existence of a 3/8 ths inch gap improperly left between the walls and the boards used for the new flooring, which further weakened it. Considered together with the floor giving way just six weeks after the sale, we find the evidence presented sufficient to support the trial court's finding of negligent repairs.
It should be noted Cernich denies performing any repairs on the area of the floor through which Mr. Rowell fell. Assuming for the sake of argument no repairs were performed on this area, we agree with the trial court's conclusion this in itself would constitute negligence. Both LNB and plaintiffs relied completely on Carter's expertise to ensure the performance of any necessary repairs. This reliance was known to Carter and Cernich. It is clear the area of the floor in question was weak and in need of additional support at the time of Mr. Rowell's fall. From the evidence, it appears more probable than not this same condition existed at the time of the sale. (See footnote 3.) As a repairman Cernich had a duty to inspect this mobile home and warn of any unrepaired defects. Cernich did in fact personally inspect the mobile home upon the completion of repairs. He was negligent in not discovering the dangerous condition of the entryway flooring at this time and either repairing it or warning of its existence.[4] His negligence is imputable to his employer.
Our overview of the respective duties and actions of the parties leads us to conclude fault should be apportioned between Cernich and Carter's unnamed employee(s) with 65% being allocated to Cernich for his pre-sale conduct and 35% being allocated to Carter's unnamed employee(s) for post-sale conduct. In reaching this result we have been guided by the factors enumerated in Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), at pp. 973, 974. However, the allocation of fault as between the employee tortfeasors whose conduct actually caused plaintiff's injuries is of no moment in this instance since Carter is in fact liable as an employer for 100% of the damage.

APPLICABLE LAW
Even though we conclude LNB itself was not guilty of any actual fault,[5] it would ordinarily be vicariously liable for Carter's fault because of the reasons previously given. At least prior to Sampay v. Morton Salt Co., 395 So.2d 326 (La.1981), if Carter had not been released, LNB would then have been entitled to legal indemnification from Carter, one of the parties actually at *647 fault in causing the plaintiff's injuries. Narcise v. Illinois Cent. R. Co., 427 So.2d 1192 (La.1983); Robinson v. State Through Dept. of Transp., 454 So.2d 257, 265 (La.App. 1st Cir.1984), writ denied, 458 So.2d 122 (La.1984). However, in view of Sampay it is unclear what effect, if any, Carter's release has upon LNB's liability.
In Sampay the Supreme Court held where there are primary and derivative obligors, these obligors are solidarily liable, and release of the primary obligor does not release the derivative obligor. This holding has created great confusion in the indemnity situation, long recognized to be one where the obligations included are primary and derivative. Release of the primary obligation has traditionally released the derivative obligation. However, it no longer does so according to Sampay. Sampay left unanswered the question of what sort of relief the derivative obligor is entitled to against the primary obligor, where the latter has been released by the obligee, reserving rights against the derivative obligor. Has indemnity of the vicarious obligor been eliminated? If not, can the vicarious obligor proceed against the primary obligor for indemnity even though the primary obligor has settled? If so, why should the primary obligor ever settle?
Sampay involved the employer-employee relationship and not a principal-mandatary relationship. In tort law, both relationships are primary and derivative, generally involving liability imposed upon the employee or mandatary for his actual or causative fault, as distinguished from the vicarious liability imposed upon the employer or principal. Therefore, the same indemnification precepts are applicable. As regards the employer-employee relationship, where the employee has settled, note the recent retrospective and prospective provisions of La.R.S. 9:3921 (Act 331 of 1984) proscribing the employer's right of contribution, division or indemnification, along with the concomitant procedural remedy. Apparently, the legislature had no interest in extending the impact of R.S. 9:3921 to other primary-derivative tort relationships. It has, however, to the extent of the employer-employee relationship, answered the indemnity questions left unanswered by Sampay.
With respect to other derivative obligors, our search of the jurisprudence has not disclosed answers, only suggestions. See, e.g., the discussion of our comparative fault system in Watson v. State Farm Fire and Cas. Ins. Co., supra, with its decision to remand for "the possible reduction attendant to plaintiff's having settled prior to trial with Farm Bureau Insurance Company." See also, Dusenbery v. McMo-Ran Exploration Co., 458 So.2d 102 (La.1984), footnote 1, p. 104. Cf. Diggs v. Hood, 772 F.2d 190 (5th Cir.1985).
The difficulty of the situation is exacerbated by comparative fault. If the primary obligor settles and rights are reserved against the vicarious solidary (according to Sampay) obligor, and the primary obligor's fault is fixed at 100 per cent, what is the obligation of the vicarious obligor, whose liability is totally derivative, to the obligee?
Implicit in Sampay is the conclusion primary and derivative obligors are each liable for virile shares. Prior to our adoption of a comparative fault system, there was no other basis for fixing an employer's liability when his negligent employee was released by the plaintiff and the employer itself was not guilty of any independent fault. See Robertson, Ruminations on Comparative Fault, Duty-Risk Analysis, Affirmative Defenses, and Defensive Doctrines in Negligence and Strict Liability Litigation in Louisiana, 44 La.L.Rev. 1341, 1384 (1984); Johnson, Obligations, 42 La.L.Rev. 388 (1982); Comment, Tilting Against Windmills: A Solidary Rejoinder, 41 La.L.Rev. 1279, 1288 (1981). However, in our view, the subsequent adoption of a comparative fault system in this state negates this position. La.Civ.Code art. *648 2103, as amended by Act 431 of 1979, effective August 1, 1980, and in effect at the time of plaintiff's injury, provided a solidary obligation resulting from an offense or a quasi-offense shall be divided in proportion to each debtor's fault.[6] Where the derivative obligor is not guilty of any independent fault, no additional percentage of fault can be assessed to it under La.Civ. Code art. 2103 or its successor articles, other than the primary obligor's percentage of fault. Thus in such cases, the obligation of the derivative obligor is identical to that of the primary obligor.
We find LNB had legal responsibility for Carter's actions, but was not guilty of any independent fault. Therefore, LNB's ultimate responsibility was to pay the portion of the debt owed by the primary obligor, Carter, i.e., the portion of the debt equal to Carter's percentage of fault. This portion of the debt has been fully satisfied by the plaintiffs' settlement with Carter. And, this portion having been extinguished by the settlement with Carter, plaintiffs are not entitled to any recovery against LNB. There being no statutory or codal preclusion, and considering the application of the comparative fault doctrine, we hold that in a principal-mandatary relationship the release of the primarily liable person or entity accomplishes the release of the vicariously liable person or entity. The judgment of the trial court holding LNB liable for 50 per cent of plaintiff's injuries is hereby reversed and judgment is rendered in favor of LNB rejecting the plaintiffs' demand.[7]
Costs on appeal are assessed against plaintiffs.
REVERSED AND RENDERED.
NOTES
[1] The original owner (mortgagor) from whom this mobile home was repossessed is not a party in this suit.
[2] In their briefs, the parties raise some question as to whether Cernich was an employee-servant of Carter or an independent contractor. For the following reasons, we conclude he was the former. In Blanchard v. Ogima, 253 La. 34, 215 So.2d 902 (1968), the court defined a "servant" as one who:

"... has a very close economic relation to, and is subject to very close control by, the principal. A servant is one who offers his personal services for a price. He is an integral part of his employer's business...." at p. 906.
The most important element in determining the existence of such a relationship is the right of control and supervision. Savoie v. Fireman's Fund Ins. Co., 347 So.2d 188 (La.1977); Blanchard, supra. The supervision and control which is actually exercised is less significant. Arledge v. Royal-Globe Ins. Co., 401 So.2d 615 (La. App.3d Cir.1981). See also, Sellers v. City of Abbeville, 458 So.2d 592 (La.App.3d Cir.1984), writ denied, 462 So.2d 1248 (La.1985); (Gaspard v. Travelers Insurance Company, 284 So.2d 104 (La.App.3d Cir.1973).
There was a close and long-standing relationship of at least fifteen years duration between Cernich and Carter. Cernich and the employees hired by him performed all of Carter's repair work, with the exception of repairs performed on location. Cernich was an integral part of Carter's business and performed very little, if any, work for anyone else. The repairshop he used was located in a structure built by Carter on land which it leased from Cernich. Carter supplied all of the parts used by Cernich in his repairs. Cernich's work was billed out under Carter's name rather than his own. Carter paid Cernich by the hour rather than by the job. Although it does not appear Carter exercised especially close control over Cernich, the testimony of the pertinent parties indicates he was ultimately subject to such control.
[3] LNB maintains repairs on the entryway floor were performed by a Carter serviceman in December of 1981, after the sale and prior to Mr. Rowell's fall. It claims it was these repairs, for which it can not be held responsible, which were negligently performed causing Mr. Rowell's fall. LNB bases this position upon a Carter invoice dated December 21, 1981 (Plaintiff's exhibit number 11) which indicates replacement of flooring at the front door. However, no testimony was presented to show either who had performed these repairs or prepared the invoice. Mrs. Frazier, Carter's office manager, noted there was no signature on this invoice to indicate who had prepared it. Nor was the serviceman who performed the alleged repairs produced to corroborate this claim. Also, a date subsequent to the fall is noted on the invoice which adds to the doubt cast upon its probative value.

In contradiction of this claim, Mrs. Rowell explicitly testified no one from Carter performed any repairs prior to her husband's fall. She stated a repairman did come out to repair the floor at the front door, but only after her husband's fall. The uncorroborated invoice relied upon by LNB is the only evidence contravening Mrs. Rowell's statements. Considering all the circumstances present, we conclude it is insufficient to establish repairs were made by Carter after the sale but prior to Rowell's fall.
[4] In his brief, Cernich argues he should be covered under Carter's insurance since he was a Carter employee. Since Cernich neither filed suit nor a third party demand requesting such relief, this issue is not properly before the Court.
[5] Plaintiffs argue LNB was guilty of actual fault in concocting a fraudulent scheme to sell mobile homes it owned through Carter, so as to avoid any potential liability to the vendee. This argument is without merit. The sale procedure utilized by the parties had absolutely no bearing on the manner in which the repairs on plaintiffs' mobile home were performed. Thus, it can not be considered the basis of any fault by LNB which caused injury to plaintiffs. In so stating, this Court does not imply LNB was engaged in a fraudulent scheme. To the contrary, we find no proof of any fraud being committed by LNB.
[6] This article was vacated by Acts 1984, No. 331, effective January 1, 1985. The subject matter of this former article is now contained in La.Civ. Code arts. 1804 and 1805.
[7] In view of our holding plaintiffs are not entitled to any recovery against LNB, we pretermit consideration of the issues raised by LNB with respect to its third party demands and quantum. Additionally, since Cernich was not case in judgment below, he did not appeal. Plaintiffs did not answer LNB's appeal nor appeal the judgment dismissing Cernich. Consequently, we cannot render judgment in favor of plaintiffs and against Cernich. Cernich is before the court only on LNB's appeal of dismissal of its third party demand against him.