619 So.2d 1188 (1993)
Laurie J. JENKINS, Individually and as Natural Tutrix of Her Minor Child, Eddie Ross Jenkins
v.
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
No. 91 CA 2285.
Court of Appeal of Louisiana, First Circuit.
May 28, 1993.
*1190 J.J. McKernan, Paul H. Due and Donald W. Price, Baton Rouge, LA, for Laurie Jenkins.
Douglas W. Olsen and Ronny Champlin, Baton Rouge, LA, for State-Dept. of Transp. & Development.
Felicien P. Lozes, New Orleans, LA, for LA Paving Co.
Before WATKINS, CRAIN and GONZALES, JJ.
CRAIN, Judge.
This is an appeal from a judgment rendered by the trial court in a personal injury action.
On the evening of March 22, 1988, Laurie J. Jenkins was a passenger in a Toyota pick-up truck owned and driven by Danny Graham. Graham traveled south on Wheat Road to its intersection with La. Hwy. 42 (a two lane highway which runs in an east-west direction). He turned right onto La. Hwy. 42 traveling in a westerly direction towards the town of Port Vincent. Approximately 1½ miles west of the Wheat Road intersection La. Hwy. 42 curves to the left. Graham was in the right lane, the high side of the curve. While negotiating the curve, the right wheel of Graham's vehicle left the roadway moving onto the shoulder. Graham was unable to steer his vehicle back onto the highway. The vehicle traveled over one hundred feet from the point where it left the asphalt until it struck the embankment of a ramp or driveway which spanned the ditch which was located to the right (north) of the roadway. The vehicle went airborne and landed west of the ramp. Ms. Jenkins was thrown from the vehicle and was severely injured. She is a quadriplegic as a result of this accident. At the time of the accident pursuant to a contract with the State, the roadway was in the process of being repaired and resurfaced. Louisiana Paving Company was the contractor.
Ms. Jenkins instituted this action on her own behalf and on behalf of her minor son, Eddie Ross Jenkins, against Graham and Graham's insurer; Louisiana Paving Company (La. Paving) and its insurer; and the State of Louisiana Department of Transportation and Development (DOTD). DOTD instituted a third party action against La. Paving for indemnity or, alternatively, contribution. All defendants in the main demand, except DOTD, entered into a compromise and settlement agreement with plaintiffs. After a bench trial judgment was rendered in favor of plaintiffs against DOTD. The trial court also rendered judgment against DOTD and in favor of La. Paving in the third party action.
DOTD has appealed alleging sixty-five assignments of error. The issues for review are whether the trial court erred in attributing fault to DOTD, and in attributing no fault to La. Paving, Danny Graham and Laurie Jenkins; whether Louisiana Paving is liable in indemnity to DOTD; quantum; and whether La.R.S. 13:5106, which limits general damages recoverable from the state, is an affirmative defense which must be pleaded or else waived.

STANDARD OF REVIEW
The evidence before the trier of fact consisted solely of written reports, records, depositions, documents and exhibits. The applicable standard of review is that of manifest error. Bruno v. Harbert International, Inc., 593 So.2d 357 (La.1992).

FAULT OF DOTD
In numerous assignments of error DOTD contends that the trial court erred in determining that the accident was caused by the fault of DOTD in failing to sign and stripe or mark a dangerous curve; in failing to *1191 maintain a safe shoulder adjacent to the curve and in failing to adequately warn oncoming motorists of the low shoulder.
The elements of proving the liability of DOTD based on the defective condition of a roadway are the same whether based on La.C.C. arts. 2315 or 2317. The plaintiff must prove custody or ownership of the defective thing; the defect created an unreasonable risk of harm; actual or constructive knowledge of the defect or risk of harm and failure to take corrective action within a reasonable time; and causation. Valet v. City of Hammond, 577 So.2d 155 (La.App. 1st Cir.1991).
"[T]he reasonableness of the risk is determined by balancing the probability and magnitude of the risk against the utility of the thing. Under either theory of liability, the court must decide if the risk, which causes the injury is within the ambit of protection of the duty." Nicholes v. St. Helena Parish Police Jury, 604 So.2d 1023, 1027 (La.App. 1st Cir.), writ denied, 605 So.2d 1378 (La.1992).
The state has the duty to maintain its highways in a reasonably safe condition and to remedy or at least warn motorists of the presence of the conditions which make the roadway unsafe. Boudreaux v. Farmer, 604 So.2d 641 (La.App. 1st Cir.1992), writ denied, 605 So.2d 1373, 1374 (La. 1992). The determination that a breach of this duty has occurred depends on the facts and circumstances of each case. Id. at 651.
In written reasons for judgment the trial court found that the curve was defective in design in that:
(1) The curve was compound with varying radii which gave the appearance to an oncoming motorist that the curve was about to straighten out when in fact it would not;
(2) The slope of the curve in certain portions was actually higher in the center than on the outside aiding centrifugal forces in moving the car to the outside of the roadway;
(3) The curve had varying super elevation measurements making it harder for a motorist to control his vehicle;
(4) The curve had a substandard lane width;
(5) The curve was not marked with edge striping desire (sic) the fact that it was narrower than portions of the same road close by that were striped; and
(6) The road had no warnings of a dangerous curve or a low shoulder.
He further found that the curve had a curvature of 7.5 to 8 degrees; it should have been marked or signed; no curve warning sign was in place at the time of the accident; and in addition to a curve sign, the curve should have been marked with a chevron sign, edge striping and an advisory speed limit. The trial court also found that the shoulder was defective in that at the time of the accident there was a severe vertical dropoff from the edge of the asphalt to the shoulder (of between 6-10 inches); a severe dropoff (4½ to 8½ inches) preexisted the construction contract; and the overlay increased the preexisting dropoff by 1½ inches. He further found that the state had actual and constructive notice of the various defects; breached the duty of maintaining a safe roadway and shoulder which it owed to the motoring public; and this breach was the cause of the harm suffered by Ms. Jenkins.
It is undisputed that the curve near Station 133 (the approximate location of the curve) is a super-elevated compound curve having different radii. James Clary, Ms. Jenkins' expert civil engineer, stated that a motorist driving through a uniform curve expects the curve to have an end. A compound curve with different radii, however, confuses an approaching motorist into thinking that "where you would expect it to end it does not end...." Clary visited the accident site, took measurements of the curve and reviewed the contract, work diaries and depositions. Mr. Clary stated that a superelevated curve makes a gradual change from superelevation to a flat surface. The superelevation should be consistent across a crossection of both lanes until the surface changes to a normal crown or flat surface. The reason for superelevation is two-fold: to drain water off the road and to give a certain comfort level to a *1192 driver going around the curve whereby centrifugal force will not force him or allow him to slide off the road. In this curve the slope in the westbound lane did not match that in the eastbound lane. It did not conform with a nonsuperelevated section, a superelevated section or the "run out" of a superelevated section. As of the time of the deposition, Clary had not yet evaluated whether the work and construction signs erected in the 6.9 mile construction zone, as listed in the work diaries, were adequate under the circumstances and conditions existing on the day of the accident. In Mr. Clary's opinion in addition to a curve sign, the curve should have been marked or signed with a chevron sign, edge striping and an advisory speed limit. Further, assuming the existence of a severe vertical dropoff from the asphalt to the shoulder, there should have been signs adjacent to the paved edge delineating the dropoff as well as possible flashing hazard signs, markers or barrels. Simply marking the area with low shoulder, construction and speed advisory signs is not sufficient.
An entry by DOTD into the miscellaneous records of the construction project referred to the 7 degree curve at Station 136 and reads: "This curve to be widened as per letter dated 12-4-81." Richard Holm, the acting DOTD Resident Construction Engineer and Acting Project Engineer on the construction project at issue, stated that the letter referenced in the record referred to a DOTD policy to widen to 12 feet the lanes in all curves of over 6 degrees. The lane width in this curve and adjacent roadway was 10 feet. Holm stated that the reason that wider lanes are preferable to narrower lanes in a curve of that degree is that motorists often run off the edge of the roadway in a curve of that degree; thus the wider lanes add to the motorists' protection. He admitted that the road and shoulders were inferior; that this was the reason that the construction project was being done; that a sheer 4 inch dropoff is hazardous; and that when DOTD is aware of a low shoulder or other hazard, DOTD is responsible for advising the contractor of such.
James Little, the DOTD acting District Construction Engineer on the project in March, 1988, handled all phases of construction for DOTD. His duties included seeing that the contractor performed all the work according to the specifications. He stated that before the contract was confected and the work begun, the 6.9 mile section of La. Hwy. 42 was in deplorable shape and it was suggested that DOTD tear up and restabilize the whole road. DOTD, however, decided to restabilize one portion of the highway and patch another.
He stated that permanent construction signs, (e.g. "Construction work ahead" signs) are installed by the contractor as staked out by DOTD in accordance with the contract and the Manual for Traffic Control Devices; delineators, "low shoulder" and "uneven pavement" signs should be installed as needed; "Under construction" and "Speed Limit 45" signs should be placed every 3/4 miles, 200 feet apart; and the locations of temporary or working signs (e.g. low shoulder) change from place to place as the job or conditions dictate. He further stated that it is common policy for the "low shoulder" signs to be erected once the asphalt is laid until the shoulder is brought to asphalt level. The asphalt was laid on the westbound lane at Station 133 on February 22 and no shoulder work was done at Station 133 on that side (the north shoulder) until after March 22. Since there was a difference in elevation during this period the "low shoulder" signs should have been in place; and there is no documentation of where the temporary signs, if any, were placed. He also stated that a curve sign should remain in place during the duration of the job.
Numerous witnesses testified regarding their observations of the condition of the road and shoulders and the presence of signs at and near the scene of the accident.
Angela and Linda Efferson learned of the accident while listening to their police scanner. They live on Hwy 42 one mile east of the accident scene. They drove to the scene shortly after the accident occurred and pulled over to the side of the road to park their car. They parked between *1193 Wheat Road and the mud ramp and in so doing their car "dropped way down." They exited their vehicle and observed a 5 to 6 inch dropoff from the asphalt to the shoulder. Angela Efferson recalled seeing construction signs on La. Hwy. 42 but was not sure whether there were signs at the site. Linda Efferson did not recall seeing any "low shoulder" or any other signs in the curve area. She did recall seeing construction signs two miles east of the site and "45 miles per hour" signs all along the highway. William Efferson who also lived east of the site visited the area the following day and observed a 4 to 6 inch dropoff which started where the Graham vehicle originally left the road. He stated there had never been any "shoulder there to amount to nothing" at the curve. He did not recall seeing any "low shoulder" signs in the area and none were installed after the asphalt overlay had begun.
W.J. Jenkins, Laurie Jenkins' father, visited the accident site two to three days after the accident with his two sons-in-law, Obie Booty and Rodney Hankins. Mr. Jenkins traveled west on La. Hwy. 42 through the curve and saw a curve sign just before approaching the curve. Neither Rodney Hankins nor Obie Bootie recalled seeing warning signs in the area. Hankins stated that he did not pay attention to signs. He recalled observing an 8 to 10 inch dropoff.
On the night of the accident, Elliott Howze stopped his truck to help the accident victims and noticed an 8 to 10 inch dropoff along the highway. He saw no warning signs, low shoulder signs, curve sign, speed limit or road construction signs in the area.
Randy Deakens was riding with Elliott Howze on the night of the accident. He also went to assist the accident victims and observed an 8 inch dropoff as he stepped off the asphalt to the shoulder. He saw no warning signs where the accident occurred but stated he did not pay attention to such.
Fred Gilbert Magee, an ambulance attendant who assisted at the scene of the accident, related that he twisted his leg when stepping 6 to 8 inches off of the roadway to the shoulder. He saw no "low shoulder" signs in the area.
Dana Dupuy visited the site the day following the accident. The bottom of her car scraped the asphalt as she pulled over to the shoulder where she observed a 6-8 inch dropoff. She did not see any signs. She stated that although she was "just looking" had signs been present she would have seen one.
Kent Sullivan went to the accident site the morning after the accident to search for some of Danny Graham's tools. He saw a 6 inch dropoff where the truck left the road. He did not see any low shoulder, construction or curve signs.
Vicki Hankins, Laurie Jenkins' sister, visited the site the day after the accident. She saw the shoulder was low (between 6 to 10 to 12 inches). She drove the length of the construction project looking for signs and saw no construction, or "low shoulder" signs. She could not recall whether she saw "45 mph" signs in the area.
Kenneth Cason, an accident investigator employed by a law firm which Danny Graham had considered retaining, visited the accident site with Danny Graham one to two days after the accident. He measured the dropoff with a ruler. The dropoff varied from 6 to 8 inches depending on location. He observed where Graham's vehicle ran off the highway and where he tried to get back onto the road. The location was evident because he observed that a 10 or 11 foot long section of asphalt was scraped or knocked off by either the undercarriage or the right tire of Graham's vehicle. He drove east and west on the 6 mile section of highway looking for signs and saw no "low shoulder" signs in the curve area.
Danny Graham stated that he entered La. Highway 42 from Wheat Road and drove in a westerly direction on the highway. He had no recollection of what, if any, signs and markers were present at the site. He stated that he did not pay attention to the signs and markers; that he was watching the road because it was dark. When his right wheels left the road the bottom of the truck was scraping the asphalt. *1194 He stated that he returned to the accident site two days later with Kenneth Cason. At that time the shoulder had already been repaired and he observed road construction signs, advisory speed signs, "low shoulder" signs, and the curve was marked with a curve sign. In a subsequent deposition he expressed some confusion as to what he saw on subsequent visits to the site.
Further evidence of the pre-existence of the low shoulder was given by the testimony of Clyde Morris who was employed by T.L. James at La. Paving as the operator of a motor patrol. Prior to the application of an asphalt overlay, all vegetation, dirt and rubble must be removed from the pre-existing roadway. This is accomplished by using the motor patrol to scrape and cut back the grass or vegetation on the edge of the asphalt with a flat blade so that the asphalt team can visualize the edge of the asphalt when applying the overlay. This process does not change the shape of the shoulder. Mr. Morris recalled the section of the highway between Wheat Road and the mud ramp. He stated that there was nothing to scrape from the edge of the old asphalt in that area because on the high side (north side) of the curve the old asphalt protruded approximately 6 to 12 inches above the existing shoulder.
Huland Martinez, employed as an Engineering Aide II by DOTD, worked at the construction site during the overlay project. He stated that his duties included among other things checking whether required signs were in place. If he observed a "low shoulder" sign was needed he would so advise the contractor.
B.J. Albin was employed as an Engineering Technician Supervisor on the overlay project. Mr. Albin did not remember "low shoulder" signs near the accident site. He specifically recalled the placement of "low shoulder" signs and delineators at stations 230 and 270 and stated that such signs should remain in place until the shoulder is repaired. In his opinion a 2 inch drop for a three to five foot long track would be considered dangerous, triggering notice by DOTD to the contractor to fix the shoulder or install the appropriate signs.
A risk of having a curve of over 6 degrees in a 10 foot wide lane is that motorists often stray off the roadway onto the shoulder. Thus it is particularly important for the shoulder in that location to be maintained in a safe condition. Graham failed to negotiate the curve and strayed onto the shoulder. The drop off was so severe that the bottom of his truck scraped the asphalt roadway. He was unable to return to the roadway before striking the mudramp.
After careful review of the record we find no error in the trial court's conclusion that the curve and shoulder were defective; that the defect was present before construction began; the shoulder should have been repaired or at the very least adequate warnings, signs or barricades should have been erected to warn the motoring public of the grave danger. The combination of these factors created an unreasonable risk of harm to plaintiff which was a cause of the accident.
DOTD had actual or constructive knowledge of the damage-causing defect prior to the accident, had reasonable opportunity to remedy the defect and failed to do so. DOTD employees were present at the worksite on a daily basis. They should have been aware, if indeed they were not actually aware, of the configuration of the curve, lane width, as well as the low shoulder and of the need to properly and adequately mark or sign the curve and shoulder in order to notify the motoring public of the danger.
Section 107.07 of the Louisiana Standard Specifications for Roads and Bridges (1982) (the Gold Book) was adopted as part of the contract. In this section, La. Paving agrees to assume the duty to protect the safety of the general public. DOTD contends that its duty to maintain the highway was shifted to La. Paving by the construction contract. However, we have previously held that for purposes of liability to third persons the duty of DOTD to maintain state highways is nondelegable. Boudreaux, 604 So.2d at 651. Thus DOTD is liable to plaintiff for injuries suffered as *1195 a result of its breach. Additionally, La. Paving's contractual responsibilities required the application of a 1½ inch asphalt overlay and the addition of shoulder material. It did not require the contractor to change lane width, correct the radius and slope of the curve at issue or stripe the pavement edge. These were the sole responsibility of DOTD.

FAULT OF LOUISIANA PAVING
Numerous assignments of error are alleged by DOTD regarding the trial court's determination that La. Paving was under no duty "under the contract or Louisiana law" to remedy the road conditions and determining that La. Paving is not liable to plaintiffs.
The trial court determined that subsection 104.03 of the general provisions of the contract relieves the contractor of the responsibility to repair low shoulders unless the shoulder material was torn away in a subgrading operation prior to the application of the asphalt and that subgrading was not necessary nor was it conducted in the construction area; thus, La. Paving was not required to repair or maintain the shoulder until final shoulder construction commenced. In written reasons for judgment the trial court stated that:
"To, in hindsight, require Louisiana Paving to create a shoulder would change the nature of the contract completely by requiring Louisiana Paving to bring in fill material to create a shoulder. The court thus finds Louisiana Paving had no responsibility for the defective curve, the defective shoulder or the failure to warn of either. It is clear from the contract and its diagrammatic attachments that the State informed Louisiana Paving of exactly where it wanted warning sign[sic] and none were contemplated for this low shoulder or bad curve...."
Subsection 104.03 of the contract provides in pertinent part:
104.03 MAINTENANCE OF TRAFFIC. This Subsection is amended to include the following. When the contract requires maintenance of through traffic, aggregate shoulder surfacing operations on asphaltic concrete overlays shall be conducted in accordance with the following requirements.
1. Shoulder Subgrade Preparation: Any required embankment widening shall be completed before placement of the asphaltic concrete overlay. All vegetation shall be removed from existing shoulders before beginning temporary or final shoulder construction.
2. Temporary Shoulder Construction: Temporary shoulder construction described herein shall be completed at the end of each day's operations for all asphaltic concrete courses except the final surface course. During overlay operations, if the pavement surface is more than 2" above existing shoulders at the pavement edge, the contractor shall blade and shape existing shoulder material against, and approximately level with, the new surfacing to form a temporary shoulder with a uniform slope from the pavement edge to the existing shoulder line, or to a point 10 feet from the pavement edge. If existing shoulder materials are insufficient, the contractor shall furnish, place and shape additional aggregate surfacing materials to form the temporary shoulder. Aggregate surfacing materials furnished shall conform to Section 401. Existing and/or additional materials for temporary shoulders shall be satisfactorily compacted by approved methods.
3. Final Shoulder Construction: The contractor shall begin final shoulder surfacing in accordance with plan details as soon as possible after completion of overlay operations, and in no event shall final shoulder construction lag more than 4 miles behind placement of the final lift of asphaltic concrete overlay. Prior to placing shoulder surfacing materials, temporary shoulder materials shall be satisfactorily bladed and shaped for incorporation into the new shoulders. Shoulder surfacing materials shall be placed in accordance with Subsection 401.05. Final shoulder surfacing materials placed shall be satisfactorily shaped, compacted and finished at the end of each day's operations.
*1196 The Louisiana Standard Specifications for Roads and Bridges (1982), (the Gold Book) along with special and general specifications which amend the standard specifications are incorporated into the construction contract.
Our reading of subsection 104.03 of the general provisions does not negate the responsibility or duty imposed by subsection 107.07 of the Gold Book which provides:
PUBLIC CONVENIENCE AND SAFETY. The contractor shall so conduct his work as to assure the least possible obstruction to traffic.
When the highway under construction is to be kept open for traffic, the subgrade and surfacing shall be kept reasonably free from dust and in such condition that the public can travel the road in safety. Safety and convenience of the general public and the residents along the highway, and protection of persons and property, shall be a primary responsibility of the contractor. (Emphasis added).
Section 713 of the Gold Book, is entitled "Temporary Signs Barricades and Pavement Markings." Subsection 713.01 provides in pertinent part:
Signs and barricades, and arrangements thereof, as shown on the plans, are minimum requirements. Appropriate signs for special conditions shall be furnished and installed as directed. Requirements as to proper signs, barricades or other safety precautions promulgated by the contractor's insurers are not negated by these specifications. These specifications shall not be construed as relieving the contractor of any of his responsibilities for the safety of the traveling public, for any liability in connection therewith, or compliance with State and local laws or ordinances. (Emphasis added).
Subsection 713.03 provides in pertinent part:
713.03 CONSTRUCTION REQUIREMENTS. Signs, barricades and related devices will be required when the contractor's work is in progress on portions of the work covered by the Notice to Proceed, or when operations are suspended but the traveled portion of the road is not in a safe condition for the traveling public. During such times that barricades are not in place, appropriate regulatory signs shall be erected and maintained by the contractor.
If a partial Notice to Proceed is issued, the contractor shall immediately begin erection of signs and barricades over the affected portions of the project to the extent necessary to comply with the requirements herein. When the full Notice to Proceed is issued, barricades shall be erected at the beginning and end of the project, and signing throughout the remainder of the project shall be completed.
If a full Notice to Proceed is issued, the contractor shall immediately begin erection of appropriate signs and barricades over the entire project.
In no event shall construction work under the contract begin until signs, barricades and other traffic control devices, as provided above, have been erected and approved.
When all signs to be furnished and erected by the contractor are in place and approved, the Department's forces will remove or cover any standard signs that are in conflict with temporary signs.
The contractor shall cooperate with the engineer in placing of signs, as well as the Department's forces responsible for removing Departmental signs, so that appropriate signs are in place at all times.
Signing shall remain in place and be maintained by the contractor, supplemented by additional signs as required, throughout the life of the contract.
Signs placed by the contractor shall not be removed until the contract is completed and the Department's forces have re-erected standard highway signs along the project. However, it shall be the responsibility of the Department to see that all Departmental signs are in place upon completion and acceptance of the project.
Mr. Holm stated that pursuant to this contract, La. Paving was not responsible *1197 for highway design, depth of asphalt overlay, and striping of road edges. It was required to follow contract specifications and to remedy dangerous situations at the commencement of a job and as needed on a day to day basis. This would include finishing the shoulders even with the edge of the road surface and filling low spots even if the contractor must furnish additional shoulder fill material to accomplish this. He also stated that it is the responsibility of both DOTD and the contractor to determine whether low shoulder signs are needed in an area.
A contractor doing construction work on public highways has the duty to mark, barricade or warn the public of conditions in the construction site which present an unreasonable risk of harm. Carr v. Boh Brothers Construction Company, Inc., 557 So.2d 356 (La.App. 4th Cir.), writs denied, 559 So.2d 1353 (La.1990). La. Paving contractually assumed the duty to maintain the roads and shoulders in a condition sufficient to protect the public. La. Paving breached this duty and the harm which occurred was encompassed by the scope of the risk which the duty was designed to protect. La. Paving knew of the defective shoulder and failed to repair or adequately warn against it. As such, we find the trial court erred in determining that La. Paving had no duty to repair or warn of the defective shoulder. The evidence is overwhelming that La. Paving's breach of duty was a cause of the damages suffered by Ms. Jenkins. The trial court's factual conclusions to the contrary are erroneous.

FAULT OF GRAHAM AND LAURIE JENKINS
DOTD contends that the trial court erred in refusing to find that the actions of Laurie Jenkins or alternatively Danny Graham were the cause of the accident; and that in not wearing a safety belt Ms. Jenkins failed to mitigate her damages.
A motorist has the duty to drive prudently which includes the duty to maintain control of his vehicle and to maintain a proper lookout for hazards. Paige v. Commercial Union Ins. Co., 512 So.2d 507 (La.App. 3d Cir.), writ denied, 513 So.2d 823 (La.1987).
There was no evidence to indicate that Graham was driving at an excessive rate of speed or that he was intoxicated when the accident occurred. Graham testified that he was driving within the speed limit (between 45 to 50 miles per hour), and negotiated the curve at 40-45 miles per hour. There was no evidence to the contrary. He was not familiar with the highway, the road was not lighted nor were there any center and edge stripes. His description of how the accident occurred is as follows:
Well, I went around the curve, andand, you know, I thought the road kept going straight, you know. It looked like that, you know, when you went around the curve, you know, thatthat, you know, the road was straight, you know. And so I was, you know, started going straight there, you know, an' [sic] it wasmore of the curve, you know. It was like the curve, you know, went on around. And so I kind of, you know, went like that (indicating), you know. I thought it was straight, an [sic] then when I figured out that it wasn't straight, well, then I went back that a way (indicating), and that's when my wheel dropped off, you know. And then I tried to get back on the road, and every time I'd try to go back on the road, you know, well, it kept shifting me and kept kind of throwing me down in the ditch, you know. And so then, you know, I figured well, I couldn't getit felt like a hole, or something, you know. And so then I justit just keptevery time I'd try to go back on it, you know, I could hear the bottom of my, you know, my truck dragging, it sounded like, you know. And so I tried it a couple of times, you know, and I couldn't get back on the road. So then I justit just kept throwing me down in the ditch, you know. So then I justfinally just had to follow it, you know, and go down in the ditch, you know. And then I didn't hit my brakes because if I did, I knew I would either slide into all them pine *1198 trees, you know, or something worse would happen, you know. So I just kinda let it go until I could get, you know, either get back on the road, or stop, you know. And then that's when I hit that gravel entrance, you know, coming in there, and then it just flipped, you know. justit just keptevery time I'd try to go back on it, you know, I could hear the bottom of my, you know, my truck dragging, it sounded like, you know. And so I tried it a couple of times, you know, and I couldn't get back on the road. So then I justit just kept throwing me back down in the ditch, you know. So then I justfinally just had to follow it, you know and go down in the ditch, you know. And then I didn't hit my brakes because if I did, I knew that I would either slide into all them pine trees, you know, or something worse would happen, you know. So I just kind of let it go until I could get, you know, either get back on the road or stop, you know. And then that's when I hit that gravel entrance, you know, coming in there, and then it just flipped, you know.
In written reasons for judgement the trial court found:
"Graham's vehicle inadvertently dropped off the edge of the roadway on the north side, just past the intersection of Oliver Wheat Road which intersects from the north. When Mr. Graham attempted to re-enter the highway, the right wheel of his small truck hit the road edge preventing him from re-entering the roadway safely. While attempting to slow his vehicle after finding it impossible to safely re-enter the roadway, Mr. Graham struck an unseen dirt driveway leading into the woods on the north side of the highway. His vehicle was thrown into the air and Ms. Jenkins was ejected. Ms. Jenkins suffered injuries rendering her quadriplegic. The testimony and other evidence showed that Mr. Graham acted prudently when faced with dangerous conditions and a sudden emergency. He was not at fault."
After careful review of the record and given the inherent risks presented by a compound curve which was not adequately marked and signed we cannot say the trial court was manifestly erroneous in finding that Graham's actions were not the cause of the accident.
DOTD makes much of Graham's statement given to the investigating State Trooper whereby Graham allegedly stated that Ms. Jenkins was intoxicated, fell across his lap, pinned the steering wheel and forced the vehicle off the road. When questioned regarding this alleged statement Graham stated that he did not "remember telling him like that." She did not grab the steering wheel or cause the truck to leave the roadway. In a second deposition Graham was queried again regarding Ms. Jenkins' actions:
Q. Did Laurie ever grab the steering wheel to cause you to run off the road?
A. No.
Q. Did she lay over in your lap?
A. No. You know, it's kind of hard to say, you know, because, you know, it happened so fast and, you know, and she was getting throwed around so much, you know, because them cars them trucks is so light, you know. You can just be riding down the road, you know, and they're light, you know, and a passenger just jumps up and down automatically anyway, you know.
Q. I guess what I'm getting at is: prior to running off the road, did she lay over across the seat or anything?
A. No.
Q. Okay
A. She was in pretty well control of herself, you know, I'd say, through the whole deal.
Q. Okay. Do you recall giving a statement to the officer on the night of the accident?
A. No, I don't recall giving it to him, you know, but it was kind of aI didn'tI couldn'tat the time I didn't know what happened, you know, it happened so fast. You know, I was sitting there trying to figure out what happened, *1199 you know, and it was so dark you couldn't see, you know, so
Q. Okay. Then you don't recall telling the officer that Laurie leaned over and grabbed the steering wheel?
A. No.
After careful review of the record we cannot say that the trial court's determination, that the actions of Mr. Graham and Ms. Jenkins were not a cause of the accident, was manifestly erroneous.
Former La.R.S. 32:295.1(E)(4) (prior to its amendment by La.Acts 1988, No. 759 Sec. 1, eff. August 1, 1988) allowed the admission of a plaintiff's failure to wear a safety belt to mitigate damages when the party offering the evidence proved that use of the safety belt "would have reduced the injured party's damages in an amount equal to or in excess of the amount of mitigation sought." Two percent of damages was the maximum allowable amount of reduction.
It is uncontroverted that Graham's pickup truck was equipped with properly working safety belts and that neither Graham nor Ms. Jenkins was wearing them at the time of the accident.
In written reasons for judgment the trial court found that Ms. Jenkins was ejected from the truck when it was airborne. The trial court also found that DOTD failed to offer evidence "to minimize the plaintiff's claim for damages." After careful review of the record we find no manifest error in the trial court's conclusion therein.

APPORTIONMENT OF FAULT
We have determined that both DOTD and La. Paving are at fault in causing this accident and a de novo apportionment of fault is necessary. Boudreaux, 604 So.2d at 652.
DOTD was negligent in the design of the curve, in failing to adequately sign the curve and in not requiring La. Paving to repair the defective shoulder or adequately warn of the danger. La. Paving was negligent in failing to repair the low shoulder within a reasonable time or to adequately warn motorists of its presence. Thus we apportion 50% fault to DOTD and 50% fault to La. Paving.

INDEMNITY
DOTD contends that the trial court erred in denying DOTD's indemnity claim against La. Paving.
Section 107.18 of the Gold Book is an indemnity provision by which the contractor agrees to indemnify DOTD for negligent acts of the contractor for which DOTD is liable.
Subsection 107.18 of the Gold Book provides in part:
The contractor shall indemnify the Department, its officers and employees from all suits, actions or claims brought because of injuries or damage sustained by any person or property on account of operations of the contractor; or on account of negligence in safeguarding the work; or through use of unacceptable materials in constructing the work; or because of any negligent act, omission or misconduct or the contractor....
La.R.S. 38:2216 prohibits an indemnity provision in a public contract whereby the public body may be indemnified by the contractor for damages to third parties caused by the negligence of the public body, its agents and employees.
The accident was caused in part by the design and signing of the curve, which was the sole responsibility of DOTD; as well as the failure to repair or maintain the shoulder or adequately warn the public of such which responsibility La. Paving agreed to perform. Given the concurrent negligence of DOTD and La. Paving, DOTD cannot recover in indemnity for damages arising from DOTD's own negligence. This case is distinguishable from that of Robinson v. State Department of Transportation and Development, 454 So.2d 257 (La.App. 1st Cir.), writ denied, 458 So.2d 122 (La.1984) wherein we held that because the contractor was primarily liable and DOTD secondarily liable the contractor was required to indemnify DOTD for its damages and costs. Additionally, *1200 Robinson was decided prior to the effective date of La.R.S. 38:2216.

La.R.S. 13:5106(B)(1)
DOTD contends that the general damage award of $3,000,000 is in violation of La. R.S. 13:5106(B)(1). That statute limits to $500,000 the total amount recoverable in a personal injury action against the state, exclusive of medical care and related benefits, loss of earnings and loss of future earnings.
The trial court refused to apply La.R.S. 13:5106 reasoning that it is an affirmative defense which was not raised prior to trial.
La.C.C.P. art 1005 enumerates an illustrative list of affirmative defenses. An affirmative defense must be specially pleaded. The reason for such is that an affirmative defense is a defense which will have the effect of defeating the suit on the merits; thus it is required to be specially pleaded in order to give fair and adequate notice of the nature of the defense to avoid surprising plaintiff at trial. The statutory cap is not an affirmative defense because it will not defeat the suit on the merits. Additionally the statutory cap is fixed by statute. Consequently, surprise does not result from the failure to plead the limitation. See Salter v. State Department of Health and Human Resources, 612 So.2d 163 (La. App. 1st Cir.1992). Accordingly, we reduce the general damage award to $500,000.

QUANTUM

a) Future Medical and Life Care Costs
Ms. Jenkins was twenty-five years old at the time of the injury. She has an eighth grade education and no vocational training. Her work history consists of "brief intervals" as a waitress, veterinary assistant and landscaper.
She sustained a cervical fracture at the C5-6 level which resulted in quadriplegia. After extensive hospitalization and rehabilitation she can sit upright in a wheelchair and hold her head up. She has very little neuromuscular control but is able to assist in feeding and has learned to use a joystick controlled power wheelchair. She is totally dependent on her parents for round the clock care, e.g. bowel and bladder care, eating, dressing, bathing, physical therapy and transportation. She will require personal care assistance for daily activities for life and is totally dependent on others for performing household tasks. Her parents take care of her young son.
Dr. Leo P. Blaize, III, an internist who has treated Ms. Jenkins for medical problems related to the quadriplegia, stated that her future medical prognosis is poor. She will have continuous bladder and bowel incontinence, be at increased risk for urinary tract infections, sepsis, respiratory infections, bed sores, muscle spasms, and depression. She will need medical attention in those areas for life. Her life expectancy is an additional 53.9 years.
The medical conditions she must deal with on a daily basis, are as follows: cervical vertebrae C5-C6 fracture dislocation with quadriplegia, posterior cervical fusion with wiring, continued subluxation of C5 on C6, headaches, neurogenic bowel, neurogenic bladder, mild demineralization of the bone of the pelvis, parotid gland injury, neurogenic vesical dysfunction secondary to spinal cord injury and autonomic dysreflexia.
Her physical and mental status include: quadriplegia, areflexia, dependent in all activities of daily living, poor sitting balance, unable to stand, unable to cook, unable to perform household chores, unable to drive, unable to transfer independently, unable to perform self-catheterizations, unable to perform bowel program independently, depression, anger, headaches and night sweats.
Dr. Gary S. Risszler, a Physical Medicine and Rehabilitation Specialist at the Rehabilitation Institute of New Orleans treated Ms. Jenkins when she was a patient at that institution. He stated that with optimal medical care she should live a normal life expectancy.
Robert G. Voogt is a Rehabilitation Counselor and Rehabilitation Specialist who evaluates life care plans and costs for persons who have suffered catastrophic injuries. *1201 Mr. Voogt testified that with reasonable medical certainty it is more probable than not that Ms. Jenkins will require specialized care for the remainder of her life. Mr. Voogt prepared a future life care plan tailored to Ms. Jenkins' needs. The cost of items in Mr. Voogt's plan is based on information obtained from cost surveys he has conducted in 46 states. Mr. Voogt stated that Ms. Jenkins will require ongoing medical, therapeutic and rehabilitation efforts to enable her to restructure and rebuild her life in such a way that she will have a sense of participation and accomplishment in all important areas of her life. She will require continuing physical and occupational therapy, medical and therapeutic evaluations and treatment, possible vocational training, an adapted living environment and adaptive equipment for mobility. In order for the rehabilitative process to be successful, programs which deal with the following issues are essential; joint range of motion and control of spasticity; skin care program; activities of daily living; home renovations; mobility and transportation. She will also require a variety of support and services: monitoring of her skin condition, regular evaluations and treatment from a psychiatrist, orthopedist, neurosurgeon, neurologist, internal medicine specialist, pulmonologist and urologist. Numerous medical tests will also be needed on a continuing basis: CBC/SMAC tests, CT scans, MRI, electromylegrams, x-rays, renal scans, urine cultures and urinalyses. Additionally, she will need annual therapeutic evaluations in physical, occupational and recreational therapy. She will also need 24 hours per day licensed practical nurse care; monitoring by a registered nurse twice a month; housekeeper and live-in child care services. There is a possibility that she may require future hospitalizations and surgeries due to possible complications which are anticipated with spinal cord injury patients: decubitus ulcers, kidney stones, urinary tract infections, increased upper respiratory illnesses, fractures of extremities and thrombophlebitis. She will also require specialized equipment necessary for lifetime care and medication.
Dr. Randolph Rice, an economist, testified that the present value of the future costs of Ms. Jenkins' life care and medical expenses is the sum of $8,950,752.00. In arriving at this sum Dr. Rice explained that he used an inflationary element to account for the rising costs of medical and care items, and a discount factor which allows one to earn interest on currently available money. Dr. Rice used an "offset" in these two areas and a 3% net discount factor for the support care costs. DOTD offered no evidence in contradiction of Ms. Jenkins' claim for future life care costs.
The trial court regarded the $8,950,752 cost as excessive and awarded the sum of $5,000,000. DOTD complains that the sum awarded is excessive and should be reduced to $793,000.
A reviewing court should not set aside an award of quantum unless an analysis of the facts and circumstances reveals that the trial court abused its discretion in setting the award. Reck v. Stevens, 373 So.2d 498 (La.1979). After review of the record we find the award is supported by the record and is not an abuse of discretion.

b) Future Earning Capacity
Ms. Jenkins stated that for three years prior to the accident she was living with the father of her child and had not worked, other than for occasional part time stints as a waitress, for which she was paid in cash. She had not filed an income tax return in several years. Approximately one month prior to the accident she and her son began living on their own and she was planning to return to work as a waitress in order to support herself. She estimated that she would have earned $300 per week for a forty hour week. The trial court awarded the sum of $75,000 for lost earning capacity. DOTD contends this award should be decreased.
Damages for loss of future earnings or future earning capacity should be based on the injured person's ability to earn rather than what was actually earned before the injury. Lee v. USAA Casualty Insurance Co., 540 So.2d 1083 (La.App. 1st *1202 Cir.), writs denied, 542 So.2d 514, 515 (La. 1989); reversed on other grounds, 571 So.2d 127 (La.1990). After review of the record we find no abuse of the trial court's discretion in this award.

c) Loss of Consortium
In awarding damages to the minor child for loss of consortium the trial court found that the child had been "almost totally deprived physically and psychologically of his mother". The child is cared for fully by grandparents and relatives, given the severe extent of his mother's injuries. The trial court awarded $100,000. DOTD contends this award is excessive. A careful review of the record again does not reveal an abuse of discretion.

DECREE
In accordance with the above we reverse the judgment of the trial court and assess fault at 50 per cent on the part of DOTD and 50 per cent on the part of La. Paving. We reduce all awards by the fifty per cent fault attributed to La. Paving. We amend to reduce the remaining $1,500,000 general damages assessed against DOTD to $500,000. In all other respects the judgment of the trial court is affirmed. Costs in the amount of $793.50 are assessed against DOTD.
REVERSED IN PART, AMENDED AND AS AMENDED, AFFIRMED.
GONZALES, J., dissents in part and concurs in part and assigns reasons.
GONZALES, Judge, dissenting in part, concurring in part.
I respectfully dissent, in part, from the majority opinion affirming the trial court judgment in this case for the reasons which follow.
Initially, I do not agree that the trial court properly found no fault on the part of either the driver of the vehicle or plaintiff, the passenger. With regard to the driver of the vehicle, the trial court found that he "inadvertently dropped off the edge of the roadway...." Defendant, the State of Louisiana, contends on appeal that "inadvertent" means "[n]ot attentive or observant... [or] ... [d]ue to oversight ..."; I agree. Allowing one's vehicle to stray off the traveled portion of the highway because of inattentiveness merits a percentage of fault. Brooks v. City of Baton Rouge/Parish of East Baton Rouge, 558 So.2d 1177 (La.App. 1st Cir.), writ denied, 566 So.2d 982 (La.1990). I would assign 16% fault to Mr. Graham. Further, the passenger and plaintiff herein, Ms. Jenkins was not wearing her seatbelt at the time of the accident.[1] The testimony established that Ms. Jenkins was thrown from the vehicle and it was clear her injuries resulted from being ejected from the vehicle. Mr. Graham was not thrown from the vehicle and testified to sustaining only minor injuries in the accident. The trial court refused to assign fault to plaintiff stating that the "[s]tate did not offer any evidence to minimize the plaintiff's claim for damages." I believe such reasoning is manifestly erroneous; there was simply no testimony of record which would lead one to conclude plaintiff would have been ejected from the vehicle regardless of whether she wore the safety belt. Therefore, I would therefore assign 2% fault, as limited by the statute in effect at the time of the accident, to Ms. Jenkins. See Demarest v. Progressive American Insurance Company, 552 So.2d 1329 (La.App. 5th Cir.1989).
With regard to additional allegations of fault on the part of the plaintiff in contributing to the accident, two versions of the circumstances immediately leading to the accident were given by Mr. Graham. Louisiana State Trooper Allen L. Coburn testified[2] as follows:
I asked him what happened and he said that they had ran off the road in a curve. She had fell over on his lap ... and kind *1203 of pinned the steering wheel where he couldn't negotiate. And it caused him to run off the road, at which time when he did run off the road he had flipped over.
. . . .
... When I arrived at the hospital, I talked to him in the Emergency Room. The nurses were in and out. And he recognized me at that point and called me by my first name. And we talked about the accident, and again he told me thatthe same thingthat he hadwas coming around the curve and she had fell over against him andin his lap basicallyand pinned the steering wheel and he couldn't turn it and they ran off the road.
. . . .
... [T]hat prior to him being with her that he had been home, or some location, and that he had received a phone call telling him that she was at a barroom at Springfield called Our Place, I believe is the name if I can remember correctly, and said whoever was on the phone had told him to come get her because she was extremely intoxicated.... And he had gone down there andand gotten her and was coming back home with her.
....
... To the best of my knowledge, he mentioned at the scene that she had fell over on him, but he didn'tat that point we didn't discuss much more as to why, where they were coming from, or anything to that effect. That came later at the hospital when he was in thewhen I was talking to him in depth about the accident.
Danny Graham's version of the accident, in his depositions on October 18, 1988, and November 27, 1989, was admittedly given after he had settled with plaintiff and had been released of any liability. Mr. Graham testified, on October 18, 1988, as follows:
Well, I went around the curve, andand, you know, I thought the road kept going straight, you know. It looked like that, you know, when you went around the curve, you know, thatthat, you know, the road was straight, you know. And so I was, you know, started going straight there, you know, an [sic] it wasit was more of the curve, you know. It was like the curve, you know, went on around. And so I kind of, you know, went like that (indicating), you know. I thought it was straight, and then when I figured out that it wasn't straight, well, then I went back that a way (indicating), and that's when my wheel dropped off, you know. And then I tried to get back on the road, and every time I'd try to go back on the road, you know, well, it kept shifting me and kept kind of throwing me down in the ditch, you know. And so then, you know, I figured well, I couldn't getit felt like a hole, or something, you know. And so then I justit just keptevery time I'd try to go back on it, you know, I could hear the bottom of my, you know, my truck dragging, it sounded like, you know. And so I tried it a couple of times, you know, and I couldn't get back on the road. So then I justit just kept throwing me back down in the ditch, you know. So then I justfinally just had to follow it, you know and go down in the ditch, you know. And then I didn't hit my brakes because if I did, I knew that I would either slide into all them pine trees, you know, or something worse would happen, you know. So I just kind of let it go until I could get, you know, either get back on the road or stop, you know. And then that's when I hit that gravel entrance, you know, coming in there, and then it just flipped, you know....
. . . .
... All I know is when Ilike I was going down in the ditch, you know, and I started kind of going back up, and that's when I hit it, you know. And then I guess if you'd hit on the right side, you'd start flipping, you know
. . . .
... I'd hit my brakes, you know, to try to slow down, but, you know, it was dew on the grass, you know, and you know when you just even barely hit your brakes, or anything, you know, you could feel it just trying to slide, you know. So it was best just to kind of ride it out and stop it, you *1204 know, the best you could, you know. It just happened so quick, you know.
When questioned whether he remembered telling the investigating officer that plaintiff was very intoxicated and that as they rounded the curve, she fell over in his lap and grabbed the steering wheel causing him to drive off the roadway, Mr. Graham responded:
I remember telling him something like that, but not exactly like that, you know. In other words, I was, you know, it was going by kind of like what happened, you know, from, you know, me trying to, you know, from theme, you know, not knowing the curve was there, you know, that the curve continued, and all that, you know, and trying, you know, thinking the road went one way, and it went, you know, the other way and jerking, you know, her around I imagine, you know.
. . . .
... [S]he didn't cause, you know, me to leave the roadway.
. . . .
... [S]he didn't grab no steering wheel, you know.
In Mr. Graham's second deposition, given on November 27, 1989, he testified as follows:
I was just going down the road and it kind of looked like the road went straight, you know, and then it was a big curve there, you know. And it looked like you went out of the curve, or something, you know. It's kind of hard to say, you know. It just looked like it was going straight, and I run off the road.... It didn't have a shoulder on it and I couldn't get back on the road....
. . . .
... I tried to get back on the road, and it felt like my truck was dragging the bottom or something, you know. And every time I tried to get back on the road it kept throwing me back off the road, you know. You could feel it just, you know jerkingalmost jerked the wheel out of my hand. I tried a couple of times, then it justfinally I went down in the ditch.... I wouldn't hit the brakes, you know, because I knew if I hit the brakes, you know, that it would be worse, you know. I don't remember hitting the brakesput it that way, you know.
. . . .
... That'sjust trying to get back on the road and then I just followed the ditch, you know, kind of straight until I could try to stop it and everything. And then I hit some kind of embankment or something over there, right when I was trying to get control of it.
When questioned again as to whether plaintiff fell over into his lap or grabbed the steering wheel, Mr. Graham responded:
You know, it's kind of hard to say, you know, because, you know, it happened so fast and, you know, and she was getting throwed around so much, you know, because them carsthem trucks is so light, you know. You can just be riding down the road, you know, and they're light, you know, and a passenger just jumps up and down automatically anyway, you know.
Mr. Graham denied telling the officer that plaintiff fell over and grabbed the steering wheel prior to the accident and stated, "She was in pretty well control of herself, you know I'd say, through the whole deal."
Two versions of the circumstances leading up to the accident were presented to the trial court. Mr. Graham first told a version which would tend to inculpate plaintiff, on the date of the accident when the events were fresh in his memory. Some seven months later, after Mr. Graham had been released from the lawsuit, he began to tell a different version of plaintiff's actions which was exculpatory. This convoluted and belated second version of the accident is remarkably in tune with plaintiff's theory of the case.[3]
Courts should be realistic in their evaluation of the evidence. However, under what some legal authorities are calling a new standard of appellate review, the supreme *1205 court in Stobart v. Louisiana Department of Transportation and Development, 617 So.2d 880 (La.1993), has said that the appellate power to review facts is severely limited and any facts found by a trial court are beyond our pale of review, however incredible. Even though I would be inclined to reverse the trial court on this issue, and find that Mr. Graham's second version of the events was not worthy of belief, I am compelled to join in the majority affirmance on this issue in accordance with Stobart.
I disagree with that portion of the majority opinion affirming the finding of design defects in the highway. The trial court found the following design defects in the roadway at the scene of the accident:
(1) The curve was compound with varying radii which gave the appearance to an oncoming motorist that the curve was about to straighten out when in fact it would not;
(2) The slope of the curve in certain portions was actually higher in the center than on the outside aiding centrifugal forces in moving the car to the outside of the roadway;
(3) The curve had varying super elevation measurements making it harder for a motorist to control his vehicle;
(4) The curve had a substandard lane width;
(5) The curve was not marked with edge striping des[pite] the fact that it was narrower than portions of the same road close by that were striped; and
(6) The road had no warnings of a dangerous curve or a low shoulder.
These findings by the trial court were based on the testimony of plaintiff's expert, Mr. James R. Clary, Sr., a civil engineer, who gave his deposition on February 28, 1989. Mr. Clary testified with regard to the compound curve with varying radii: "[I]t appears that the radius changesthe sharpness of the curve changes within the curve. And II'm going to do some more geometry on that curve to find out just what it is." (Emphasis added.) No further testimony was elicited from Mr. Clary after the date of his deposition. Mr. Clary went on to state in his deposition the results of his examination of the accident site:
It does not appear to be a continuous curve. The radius from what we've picked up appears to change. I want to check the radius of the curve, and from the cross-sections I took, apply the contract amount of super elevation required to see that the contractor complied with the state regulations on that matter.
....
... I read the signs and I didn't apply the station of the signs in that to the map that I drew as of yet. I read the testimony about the shoulder and also about lack of the edge drop-off signs, which would be the hazard markers that would be adjacent to the paving; I didn't see any reference to them. But I have not applied the stationing of the signs in this diary to my drawing yet.
. . . .
... It's not a uniform curve; it appears to be of several different radiuses, and the sharpness of the curve increases, decreases and it is just not your normal curve. And I'm going to do some geometry on that curve; I haven't done it as of yet.
. . . .
... The curve, as we picked it upwe picked it up with theodolite and with electronic distance measuring equipmentand the curve is not a uniform curve. It varies in sharpness, which means it varies in radius, which means it's a compound curve of some type.
. . . .
... To a person using the highway, when you have a curve, you expect it to have a beginning and you go through a curve that's uniform and you expect it to have an end. This one, you come into it and you have one degree of sharpness, and it changes to another, and then where you would expect it to end it does not end; itthere's just somethingthere's just something strange about it and II want to investigate it further.
. . . .
... The striping as of January 26, 1989, indicates center striping, no passing type *1206 stripping. It does not have edge striping, which I think is a mistake. This road is only 20 feet in width. It's a, according to the police report, a posted 55 mile an hour speed limit. And from the daily traffic information, I think the road should be wider. And in lack of width, the edge striping gives the motorist an extra safety feature to determine exactly where the roadway endsthe roadway width ends.
. . . .
... So if for any reason somebody would go off the paved surface and onto the drop-off that I've read existed at that time, then they'd have a problem. But I'm sure that a lot of people did negotiate it safely.
. . . .
... [A cross-section of the roadway and the scene of the accident] shows that one edge of the road, which would be the left-hand side, south edge, is depressed almost a foot lower than the one on the right-hand side. The crown of the road is somewhere between them but it's not a uniform slope. It doesn't conform to either a normal cross-section nor does it conform to super elevation.
. . . .
... [T]he center line of the road is lower then [sic] the outer edge and that's exactly opposite from the way a normal crown would be unless you're in a super elevated section.
. . . .
... In the super elevation requirements on sheet 1 of 3, which is page 4 of the plans, number 2 in the super elevated section, they show required leveling to achieve super elevation. So thein the super elevated sections, you are to level it upand I believe that's a pay item. And sheet 6 of plans, which is 3 of 3 of the super elevation, they give you super elevation values for rural overlays for various speeds. This is a 55 mile an hour posted speed road for normalnot during construction times. And for whatever degree of curve that is, they give you an absolute maximum and minimum that you can have for supersuper elevated sections. And theit is the contractor's responsibility to level that as required to achieve super elevation according to plans.
. . . .
... Now the super elevation ratesI'm going to check to see whether or not they comply with the design and the absolute minimum required by the state as fulfilling the contract. I'm going to go back on each one of these (indicating) and figure out what the crown is, et cetera.... I haven't done that yet, ... But with a set of plans it would be just as easy for, you know, if you had somebody that you want to check it, they could do it also.
. . . .
... Super elevation in a curve is toto drain water off the road and to give a driver going around a curve a comfort level whereby centrifugal force will not force him off the road. It will allow him to travel through that curve at certain speedswhatever the design speed is for the curve with centrifugal force equalingcentrifugal force where he will have no tendency to slide. [Emphasis added.]
Although this expert did state that the lanes should have been wider and that there should have been edge striping on the roadway, he did not state that the absence of these things caused the accident in question; nor did he state that the absence of these items violated any industry standard. Also, Mr. Clary did state that the surface of the highway was not level; however, he stated that it was the contractor's responsibility to level the highway in accordance with the plans and specifications provided by the state. Further, this expert did not state definitely that any of the other design defects found by the trial court actually existed. Mr. Clary found only that the curve was unusual and merited further investigation for possible design defects.[4]
*1207 Further, although the general vicinity of the accident was established and referred to by witnesses as encompassing a "curve", the precise location of the accident was never established. The most accurate description of the location was provided by the investigating officer, Trooper Coburn, who testified that the accident occurred on Highway 42, "18 tenths" of a mile east of Highway 63; however, Trooper Coburn admitted that his measurements were not completely accurate.
Because of the failure of the plaintiff to establish her case by a preponderance of the evidence as to the design defects, I would find the trial court committed manifest error in holding design defects existed at the accident site; there was simply no direct evidence to support such findings.
The only remaining defects in the highway (i.e., low shoulder, lack of signs, and unlevel highway surface) were all testified to be within the responsibility of the contractor to perform per his contract with the state. Thus, La. Paving actually committed the tortious offenses which caused the accident in this case, but because the state has a non-delegable responsibility to maintain public highways in a condition that is reasonably safe, the state is also liable for the negligence of its contractor.[5]Robinson v. Louisiana Department of Transportation and Development, 454 So.2d 257 (La.App. 1st Cir.), writ denied, 458 So.2d 122 (La.1984). For this reason, I would assign 82% fault to the state. However, La. Paving was released from tort liability by plaintiff. Therefore we must examine the effect this release has on the liability of the state.
In Rowell v. Carter Mobile Homes, Inc., 482 So.2d 640 (La.App. 1st Cir.1984), affirmed on other grounds, 500 So.2d 748 (La.1987), this court held that the release of the primarily liable obligor extinguishes the obligation, and precludes recovery from the derivatively liable obligor. The Rowell court reasons that these two obligors are solidarily liable, and as such, the liability of the tortfeasor remaining in the lawsuit should be reduced by the fault of the released tortfeasor. Since the percentage of fault for these two obligors would be the same, reduction by one would result in zero liability for the other.[6] 482 So.2d at 648.
*1208 The Third Circuit would reach the same result under a different rationale. In Casson v. Hartford Fire Insurance Co., 548 So.2d 66 (La.App. 3d Cir.1989), that court concluded that the vicariously or technically at-fault defendant is entitled to contractual indemnification from the principal tortfeasor who has been released by the plaintiff, and distinguished subrogation and indemnity as follow:
Contribution and indemnity are different legal tenets. One guilty of fault is not due indemnity.... Indemnity, unlike contribution, is not dependent upon subrogation to the right of the creditor, but finds its basis in the concept of unjust enrichment, i.e., the party primarily at fault is unjustly enriched when one held liable vicariously or by reason of technical fault discharges the indebtedness.
But the court went on to find that since the plaintiff had agreed to indemnify and hold harmless the principal tortfeasor against any third party demands or claims in return for its settlement, indemnification from the principal tortfeasor to the vicariously at-fault tortfeasor could be followed by indemnification from the plaintiff to the principal tortfeasor. Unfortunately, in the instant case, the actual release between La. Paving and plaintiff was not made a part of the record, though some evidence that a release did in fact occur is in the record.
Nevertheless, we are compelled to follow the holding of this court as expressed in Rowell:
[W]e hold that in a principal-mandatary relationship the release of the primarily liable person or entity accomplishes the release of the vicariously liable person or entity.
Although the supreme court in affirming Rowell on another basis, stated that:
[T]here appeared to be possible error in the court of appeal's application of our decision in Sampay ... and in its conclusion as to the effect of a servant's settlement upon the solidary liability of his master. These questions cannot be addressed in this case, however, because a proper application of the correct legal precepts render them abstract or purely academic.
Thus, the expression of the First Circuit in Rowell has not been overruled and remains the law of this circuit.[7] Therefore, I would hold that La. Paving is the principal tortfeasor in this case, and that, the state as a derivatively at-fault tortfeasor is relieved of liability as a result of plaintiff's release of La. Paving. Accordingly, I would dismiss plaintiff's claims against the state.
In all other respects, I agree with the views expressed in the majority opinion, and in particular, the majority holding applying the statutory limit on general damage recovery to $500,000.00 in personal injury suits against the state. La.R.S. 13:5106(B)(1).
Accordingly, I dissent, in part, and concur in part.
*1209 
NOTES
[1] La.R.S. 32:295.1(E.)(4) as it appeared at the time of the accident allows the assignment of a percentage of fault for failure to wear a safety belt when the use of the safety belt would have reduced the injured party's damages.
[2] Under C.E. 803, this statement is probably an excited utterance which can be given substantive weight.
[3] It is also interesting to note that in a case of this magnitude all testimony was given by deposition; no live witnesses were called at the trial of the matter.
[4] Plaintiff's expert, Mr. Clary, testified that a compound curve is one which is not uniform but changes in degree of sharpness and does not end as expected; however, he did not state categorically that the curve where the accident occurred was, in fact, a compound curve. A copy of Plaintiff's Exhibit 3 is appended hereto as Appendix "A", and purports to be an aerial photograph of the curve in question. Review of this photograph would not lead a layperson to conclude that the curve changes in degree of sharpness, or appears to end and yet does not. Hence, this exhibit alone is not of sufficient probative value to establish that such a design defect existed without expert testimony to substantiate the claim.
[5] I believe the majority opinion also errs in its assignment of fault, 50% to La. Paving and 50% to the state. Since the state is not relieved of its duty to maintain public roads and highways by contracting with another entity to perform the maintenance and/or repairs, whatever fault La. Paving has in failing to perform the necessary repairs is also imputable to the state. See Ishee v. Louisiana Department of Transportation and Development, 413 So.2d 1362 (La.App. 1st Cir. 1982). Where there is no negligence of the state independent of that of the contractor, the fault of the state is the same as that of the contractor. See Rowell v. Carter Mobile Homes, Inc., 482 So.2d at 648. Thus, under these circumstances and in accordance with the majority findings, the state would be 100% liable for plaintiff's injuries, not 50%. (The 50% fault of La. Paving is imputable to the state, which, when added to the 50% independent fault of the state (attributable to the state according to the majority opinion), equals 100% fault.)
[6] The Rowell court states:

Implicit in Sampay [v. Morton Salt Co., 395 So.2d 326 (La.1981)] is the conclusion primary and derivative obligors are each liable for virile shares. Prior to our adoption of a comparative fault system, there was no other basis for fixing an employer's liability when his negligent employee was released by the plaintiff and the employer itself was not guilty of any independent fault.... However, in our view, the subsequent adoption of a comparative fault system in this state negates this position. La.Civ.Code art. 2103, as amended by Act 431 of 1979, effective August 1, 1980, and in effect at the time of plaintiff's injury, provided a solidary obligation resulting from an offense or a quasi-offense shall be divided in proportion to each debtor's fault. Where the derivative obligor is not guilty of any independent fault, no additional percentage of fault can be assessed to it under La.Civ. Code art. 2103 or its successor articles, other than the primary obligor's percentage of fault. Thus in such cases, the obligation of the derivative obligor is identical to that of the primary obligor.
[7] The conclusion reached in the First Circuit opinion of Rowell has been cited with approval in David W. Robertson, Comparative Fault in the 1990s: Solidarity, Contribution, Indemnity.