CRAIN, Judge.
This is an appeal from a judgment rendered by the trial court in a personal injury action.
On the evening of March 22,1988, Laurie J. Jenkins was a passenger in a Toyota pick-up truck owned and driven by Danny Graham. Graham traveled south on Wheat Road to its intersection with La. Hwy. 42 (a two lane highway which runs in an east-west direction). He turned right onto La. Hwy. 42 traveling in a westerly direction towards the town of Port Vincent. Approximately IV2 miles west of the Wheat Road intersection La. Hwy. 42 curves to the left. Graham was in the right lane, the high side of the curve. While negotiating the curve, the right wheel of Graham’s vehicle left the roadway moving onto the shoulder. Graham was unable to steer his vehicle back onto the highway. The vehicle traveled over one hundred feet from the point where it left the asphalt until it struck the embankment of a ramp or driveway which spanned the ditch which was located to the right (north) of the roadway. The vehicle went airborne and landed west of the ramp. Ms. Jenkins was thrown from the vehicle and was severely injured. She is a quadriplegic as a result of this accident. At the time of the accident pursuant to a contract with the State, the roadway was in the process of being repaired and resurfaced. Louisiana Paving Company was the contractor.
Ms. Jenkins instituted this action on her own behalf and on behalf of her minor son, Eddie Ross Jenkins, against Graham and Graham’s insurer; Louisiana Paving Company (La. Paving) and its insurer; and the State of Louisiana Department of Transportation and Development (DOTD). DOTD instituted a third party action against La. Paving for indemnity or, alternatively, contribution. All defendants in the main demand, except DOTD, entered into a compromise and settlement agreement with plaintiffs. After a bench trial judgment was rendered in favor of plaintiffs against DOTD. The trial court also rendered judgment against DOTD and in favor of La. Paving in the third party action.
DOTD has appealed alleging sixty-five assignments of error. The issues for review are whether the trial court erred in attributing fault to DOTD, and in attributing no fault to La. Paving, Danny Graham and Laurie Jenkins; whether Louisiana Paving is liable in indemnity to DOTD; quantum; and whether La.R.S. 13:5106, which limits general damages recoverable from the state, is an affirmative defense which must be pleaded or else waived.
STANDARD OF REVIEW
The evidence before the trier of fact consisted solely of written reports, records, depositions, documents and exhibits. The applicable standard of review is that of manifest error. Bruno v. Harbert International, Inc., 593 So.2d 357 (La.1992).
FAULT OF DOTD
In numerous assignments of error DOTD contends that the trial court erred in determining that the accident was caused by the fault of DOTD in failing to sign and stripe or mark a dangerous curve; in failing to *1191 maintain a safe shoulder adjacent to the curve and in failing to adequately warn oncoming motorists of the low shoulder.
The elements of proving the liability of DOTD based on the defective condition of a roadway are the same whether based on La.C.C. arts. 2315 or 2317. The plaintiff must prove custody or ownership of the defective thing; the defect created an unreasonable risk of harm; actual or constructive knowledge of the defect or risk of harm and failure to take corrective action within a reasonable time; and causation. Valet v. City of Hammond, 577 So.2d 155 (La.App. 1st Cir.1991).
“[T]he reasonableness of the risk is determined by balancing the probability and magnitude of the risk against the utility of the thing. Under either theory of liability, the court must decide if the risk, which causes the injury is within the ambit of protection of the duty.” Nicholes v. St. Helena Parish Police Jury, 604 So.2d 1023, 1027 (La.App. 1st Cir.), writ denied, 605 So.2d 1378 (La.1992).
The state has the duty to maintain its highways in a reasonably safe condition and to remedy or at least warn motorists of the presence of the conditions which make the roadway unsafe. Boudreaux v. Farmer, 604 So.2d 641 (La.App. 1st Cir.1992), writ denied, 605 So.2d 1373, 1374 (La.1992). The determination that a breach of this duty has occurred depends on the facts and circumstances of each case. Id. at 651.
In written reasons for judgment the trial court found that the curve was defective in design in that:
(1) The curve was compound with varying radii which gave the appearance to an oncoming motorist that the curve was about to straighten out when in fact it would not;
(2) The slope of the curve in certain portions was actually higher in the center than on the outside aiding centrifugal forces in moving the car to the outside of the roadway;
(3) The curve had varying super elevation measurements making it harder for a motorist to control his vehicle;
(4) The curve had a substandard lane width;
(5) The curve was not marked with edge striping desire (sic) the fact that it was narrower than portions of the same road close by that were striped; and
(6) The road had no warnings of a dangerous curve or a low shoulder.
He further found that the curve had a curvature of 7.5 to 8 degrees; it should have been marked or signed; no curve warning sign was in place at the time of the accident; and in addition to a curve sign, the curve should have been marked with a chevron sign, edge striping and an advisory speed limit. The trial court also found that the shoulder was defective in that at the time of the accident there was a severe vertical dropoff from the edge of the asphalt to the shoulder (of between 6-10 inches); a severe dropoff (4lh to 8½ inches) preexisted the construction contract; and the overlay increased the preexisting dropoff by IV2 inches. He further found that the state had actual and constructive notice of the various defects; breached the duty of maintaining a safe roadway and shoulder which it owed to the motoring public; and this breach was the cause of the harm suffered by Ms. Jenkins.
It is undisputed that the curve near Station 133 (the approximate location of the curve) is a super-elevated compound curve having different radii. James Clary, Ms. Jenkins’ expert civil engineer, stated that a motorist driving through a uniform curve expects the curve to have an end. A compound curve with different radii, however, confuses an approaching motorist into thinking that “where you would expect it to end it does not end....” Clary visited the accident site, took measurements of the curve and reviewed the contract, work diaries and depositions. Mr. Clary stated that a superelevated curve makes a gradual change from superelevation to a flat surface. The superelevation should be consistent across a crossection of both lanes until the surface changes to a normal crown or flat surface. The reason for superelevation is two-fold: to drain water off the road and to give a certain comfort level to a *1192 driver going around the curve whereby centrifugal force will not force him or allow him to slide off the road. In this curve the slope in the westbound lane did not match that in the eastbound lane. It did not conform with a nonsuperelevated section, a superelevated section or the “run out” of a superelevated section. As of the time of the deposition, Clary had not yet evaluated whether the work and construction signs erected in the 6.9 mile construction zone, as listed in the work diaries, were adequate under the circumstances and conditions existing on the day of the accident. In Mr. Clary’s opinion in addition to a curve sign, the curve should have been marked or signed with a chevron sign, edge striping and an advisory speed limit. Further, assuming the existence of a severe vertical dropoff from the asphalt to the shoulder, there should have been signs adjacent to the paved edge delineating the dropoff as well as possible flashing hazard signs, markers or barrels. Simply marking the area with low shoulder, construction and speed advisory signs is not sufficient.
An entry by DOTD into the miscellaneous records of the construction project referred to the 7 degree curve at Station 186 and reads: “This curve to be widened as per letter dated 12-4-81.” Richard Holm, the acting DOTD Resident Construction Engineer and Acting Project Engineer on the construction project at issue, stated that the letter referenced in the record referred to a DOTD policy to widen to 12 feet the lanes in all curves of over 6 degrees. The lane width in this curve and adjacent roadway was 10 feet. Holm stated that the reason that wider lanes are preferable to narrower lanes in a curve of that degree is that motorists often run off the edge of the roadway in a curve of that degree; thus the wider lanes add to the motorists’ protection. He admitted that the road and shoulders were inferior; that this was the reason that the construction project was being done; that a sheer 4 inch dropoff is hazardous; and that when DOTD is aware of a low shoulder or other hazard, DOTD is responsible for advising the contractor of such.
James Little, the DOTD acting District Construction Engineer on the project in March, 1988, handled all phases of construction for DOTD. His duties included seeing that the contractor performed all the work according to the specifications. He stated that before the contract was confected and the work begun, the 6.9 mile section of La. Hwy. 42 was in deplorable shape and it was suggested that DOTD tear up and restabilize the whole road. DOTD, however, decided to restabilize one portion of the highway and patch another.
He stated that permanent construction signs, (e.g. “Construction work ahead” signs) are installed by the contractor as staked out by DOTD in accordance with the contract and the Manual for Traffic Control Devices; delineators, “low shoulder” and “uneven pavement” signs should be installed as needed; “Under construction” and “Speed Limit 45” signs should be placed every ¾ miles, 200 feet apart; and the locations of temporary or working signs (e.g. low shoulder) change from place to place as the job or conditions dictate. He further stated that it is common policy for the “low shoulder” signs to be erected once the asphalt is laid until the shoulder is brought to asphalt level. The asphalt was laid on the westbound lane at Station 133 on February 22 and no shoulder work was done at Station 133 on that side (the north shoulder) until after March 22. Since there was a difference in elevation during this period the “low shoulder” signs should have been in place; and there is no documentation of where the temporary signs, if any, were placed. He also stated that a curve sign should remain in place during the duration of the job.
Numerous witnesses testified regarding their observations of the condition of the road and shoulders and the presence of signs at and near the scene of the accident.
Angela and Linda Efferson learned of the accident while listening to their police scanner. They live on Hwy 42 one mile east of the accident scene. They drove to the scene shortly after the accident occurred and pulled over to the side of the road to park their car. They parked be *1193 tween Wheat Road and the mud ramp and in so doing their car “dropped way down.” They exited their vehicle and observed a 5 to 6 inch dropoff from the asphalt to the shoulder. Angela Efferson recalled seeing construction signs on La. Hwy. 42 but was not sure whether there were signs at the site. Linda Efferson did not recall seeing any “low shoulder” or any other signs in the curve area. She did recall seeing construction signs two miles east of the site and “45 miles per hour” signs all along the highway. William Efferson who also lived east of the site visited the area the following day and observed a 4 to 6 inch dropoff which started where the Graham vehicle originally left the road. He stated there had never been any “shoulder there to amount to nothing” at the curve. He did not recall seeing any “low shoulder” signs in the area and none were installed after the asphalt overlay had begun.
W.J. Jenkins, Laurie Jenkins’ father, visited the accident site two to three days after the accident with his two sons-in-law, Obie Booty and Rodney Hankins. Mr. Jenkins traveled west on La. Hwy. 42 through the curve and saw a curve sign just before approaching the curve. Neither Rodney Hankins nor Obie Bootie recalled seeing warning signs in the area. Hankins stated that he did not pay attention to signs. He recalled observing an 8 to 10 inch dropoff.
On the night of the accident, Elliott Howze stopped his truck to help the accident victims and noticed an 8 to 10 inch dropoff along the highway. He saw no warning signs, low shoulder signs, curve sign, speed limit or road construction signs in the area.
Randy Deakens was riding with Elliott Howze on the night of the accident. He also went to assist the accident victims and observed an 8 inch dropoff as he stepped off the asphalt to the shoulder. He saw no warning signs where the accident occurred but stated he did not pay attention to such.
Fred Gilbert Magee, an ambulance attendant who assisted at the scene of the accident, related that he twisted his leg when stepping 6 to 8 inches off of the roadway to the shoulder. He saw no “low shoulder” signs in the area.
Dana Dupuy visited the site the day following the accident. The bottom of her car scraped the asphalt as she pulled over to the shoulder where she observed a 6-8 inch dropoff. She did not see any signs. She stated that although she was “just looking” had signs been present she would have seen one.
Kent Sullivan went to the accident site the morning after the accident to search for some of Danny Graham’s tools. He saw a 6 inch dropoff where the truck left the road. He did not see any low shoulder, construction or curve signs.
Vicki Hankins, Laurie Jenkins’ sister, visited the site the day after the accident. She saw the shoulder was low (between 6 to 10 to 12 inches). She drove the length of the construction project looking for signs and saw no construction, or “low shoulder” signs. She could not recall whether she saw “45 mph” signs in the area.
Kenneth Cason, an accident investigator employed by a law firm which Danny Graham had considered retaining, visited the • •accident site with Danny Graham one to two days after the accident. He measured the dropoff with a ruler. The dropoff varied from 6 to 8 inches depending on location. He observed where Graham’s vehicle ran off the highway and where he tried to get back onto the road. The location was evident because he observed that a 10 or 11 foot long section of asphalt was scraped or knocked off by either the undercarriage or the right tire of Graham’s vehicle. He drove east and west on the 6 mile section of highway looking for signs and saw no “low shoulder” signs in the curve area.
Danny Graham stated that he entered La. Highway 42 from Wheat Road and drove in a westerly direction on the highway. He had no recollection of what, if any, signs and markers were present at the site. He stated that he did not pay attention to the signs and markers; that he was watching the road because it was dark. When his right wheels left the road the bottom of the truck was scraping the as *1194 phalt. He stated that he returned to the accident site two days later with Kenneth Cason. At that time the shoulder had already been repaired and he observed road construction signs, advisory speed signs, “low shoulder” signs, and the curve was marked with a curve sign. In a subsequent deposition he expressed some confusion as to what he saw on subsequent visits to the site.
Further evidence of the pre-existence of the low shoulder was given by the testimony of Clyde Morris who was employed by T.L. James at La. Paving as the operator of a motor patrol. Prior to the application of an asphalt overlay, all vegetation, dirt and rubble must be removed from the pre-exist-ing roadway. This is accomplished by using the motor patrol to scrape and cut back the grass or vegetation on the edge of the asphalt with a flat blade so that the asphalt team can visualize the edge of the asphalt when applying the overlay. This process does not change the shape of the shoulder. Mr. Morris recalled the section of the highway between Wheat Road and the mud ramp. He stated that there was nothing to scrape from the edge of the old asphalt in that area because on the high side (north side) of the curve the old asphalt protruded approximately 6 to 12 inches above the existing shoulder.
Huland Martinez, employed as an Engineering Aide II by DOTD, worked at the construction site during the overlay project. He stated that his duties included among other things checking whether required signs were in place. If he observed a “low shoulder” sign was needed he would so advise the contractor.
B.J. Albin was employed as an Engineering Technician Supervisor on the overlay project. Mr. Albin did not remember “low shoulder” signs near the accident site. He specifically recalled the placement of “low shoulder” signs and delineators at stations 230 and 270 and stated that such signs should remain in place until the shoulder is repaired. In his opinion a 2 inch drop for a three to five foot long track would be considered dangerous, triggering notice by DOTD to the contractor to fix the shoulder or install the appropriate signs.
A risk of having a curve of over 6 degrees in a 10 foot wide lane is that motorists often stray off the roadway onto the shoulder. Thus it is particularly important for the shoulder in that location to be maintained in a safe condition. Graham failed to negotiate the curve and strayed onto the shoulder. The drop off was so severe that the bottom of his truck scraped the asphalt roadway. He was unable to return to the roadway before striking the mudramp.
After careful review of the record we find no error in the trial court’s conclusion that the curve and shoulder were defective; that the defect was present before construction began; the shoulder should have been repaired or at the very least adequate warnings, signs or barricades should have been erected to warn the motoring public of the grave danger. The combination of these factors created an unreasonable risk of harm to plaintiff which was a cause of the accident.
DOTD had actual or constructive knowledge of the damage-causing defect prior to the accident, had reasonable opportunity to remedy the defect and failed to do so. DOTD employees were present at the worksite on a daily basis. They should have been aware, if indeed they were not actually aware, of the configuration of the curve, lane width, as well as the low shoulder and of the need to properly and adequately mark or sign the curve and shoulder in order to notify the motoring public of the danger.
Section 107.07 of the Louisiana Standard Specifications for Roads and Bridges (1982) (the Gold Book) was adopted as part of the contract. In this section, La. Paving agrees to assume the duty to protect the safety of the general public. DOTD contends that its duty to maintain the highway was shifted to La. Paving by the construction contract. However, we have previously held that for purposes of liability to third persons the duty of DOTD to maintain state highways is nondelegable. Boudreaux, 604 So.2d at 651. Thus DOTD is liable to plaintiff for injuries suffered as *1195 a result of its breach. Additionally, La. Paving’s contractual responsibilities required the application of a IV2 inch asphalt overlay and the addition of shoulder material. It did not require the contractor to change lane width, correct the radius and slope of the curve at issue or stripe the pavement edge. These were the sole responsibility of DOTD.
FAULT OF LOUISIANA PAVING
Numerous assignments of error are alleged by DOTD regarding the trial court’s determination that La. Paving was under no duty “under the contract or Louisiana law” to remedy the road conditions and determining that La. Paving is not liable to plaintiffs.
The trial court determined that subsection 104.03 of the general provisions of the contract relieves the contractor of the responsibility to repair low shoulders unless the shoulder material was torn away in a subgrading operation prior to the application of the asphalt and that subgrading was not necessary nor was it conducted in the construction area; thus, La. Paving was not required to repair or maintain the shoulder until final shoulder construction commenced. In written reasons for judgment the trial court stated that:
“To, in hindsight, require Louisiana Paving to create a shoulder would change the nature of the contract completely by requiring Louisiana Paving to bring in fill material to create a shoulder. The court thus finds Louisiana Paving had no responsibility for the defective curve, the defective shoulder or the failure to warn of either. It is clear from the contract and its diagrammatic attachments that the State informed Louisiana Paving of exactly where it wanted warning sign[sic] and none were contemplated for this low shoulder or bad curve....”
Subsection 104.03 of the contract provides in pertinent part:
104.03 MAINTENANCE OF TRAFFIC. This Subsection is amended to include the following. When the contract requires maintenance of through traffic, aggregate shoulder surfacing operations on asphaltic concrete overlays shall be conducted in accordance with the following requirements.
1. Shoulder Subgrade Preparation: Any required embankment widening shall be completed before placement of the asphaltic concrete overlay. All vegetation shall be removed from existing shoulders before beginning temporary or final shoulder construction.
2. Temporary Shoulder Construction: Temporary shoulder construction described herein shall be completed at the end of each day’s operations for all as-phaltic concrete courses except the final surface course. During overlay operations, if the pavement surface is more than 2" above existing shoulders at the pavement edge, the contractor shall blade and shape existing shoulder material against, and approximately level with, the new surfacing to form a temporary shoulder with a uniform slope from the pavement edge to the existing shoulder line, or to a point 10 feet from the pavement edge. If existing shoulder materials are insufficient, the contractor shall furnish, place and shape additional aggregate surfacing materials to form the temporary shoulder. Aggregate surfacing materials furnished shall conform to Section 401. Existing and/or additional materials for temporary shoulders shall be satisfactorily compacted by approved methods.
3. Final Shoulder Construction: The contractor shall begin final shoulder surfacing in accordance with plan details as soon as possible after completion of overlay operations, and in no event shall final shoulder construction lag more than 4 miles behind placement of the final lift of asphaltic concrete overlay. Prior to placing shoulder surfacing materials, temporary shoulder materials shall be satisfactorily bladed and shaped for incorporation into the new shoulders. Shoulder surfacing materials shall be placed in accordance with Subsection 401.05. Final shoulder surfacing materials placed shall be satisfactorily shaped, compacted and finished at the end of each day’s operations.
*1196 The Louisiana Standard Specifications for Roads and Bridges (1982), (the Gold Book) along with special and general specifications which amend the standard specifications are incorporated into the construction contract.
Our reading of subsection 104.03 of the general provisions does not negate the responsibility or duty imposed by subsection 107.07 of the Gold Book which provides:
PUBLIC CONVENIENCE AND SAFETY. The contractor shall so conduct his work as to assure the least possible obstruction to traffic.
When the highway under construction is to be kept open for traffic, the sub-grade and surfacing shall be kept reasonably free from dust and in such condition that the public can travel the road in safety. Safety and convenience of the general public and the residents along the highway, and protection of persons and property, shall be a primary responsibility of the contractor. (Emphasis added).
Section 713 of the Gold Book, is entitled “Temporary Signs Barricades and Pavement Markings.” Subsection 713.01 provides in pertinent part:
Signs and barricades, and arrangements thereof, as shown on the plans, are minimum requirements. Appropriate signs for special conditions shall be furnished and installed as directed. Requirements as to proper signs, barricades or other safety precautions promulgated by the contractor’s insurers are not negated by these specifications. These specifications shall not be construed as relieving the contractor of any of his responsibilities for the safety of the traveling public, for any liability in connection therewith, or compliance with State and local laws or ordinances. (Emphasis added).
Subsection 713.03 provides in pertinent part:
713.03 CONSTRUCTION REQUIREMENTS. Signs, barricades and related devices will be required when the contractor’s work is in progress on portions of the work covered by the Notice to Proceed, or when operations are suspended but the traveled portion of the road is not in a safe condition for the traveling public. During such times that barricades are not in place, appropriate regulatory signs shall be erected and maintained by the contractor.
If a partial Notice to Proceed is issued, the contractor shall immediately begin erection of signs and barricades over the affected portions of the project to the extent necessary to comply with the requirements herein. When the full Notice to Proceed is issued, barricades shall be erected at the beginning and end of the project, and signing throughout the remainder of the project shall be completed.
If a full Notice to Proceed is issued, the contractor shall immediately begin erection of appropriate signs and barricades over the entire project.
In no event shall construction work under the contract begin until signs, barricades and other traffic control devices, as provided above, have been erected and approved.
When all signs to be furnished and erected by the contractor are in place and approved, the Department’s forces will remove or cover any standard signs that are in conflict with temporary signs.
The contractor shall cooperate with the engineer in placing of signs, as well as the Department’s forces responsible for removing Departmental signs, so that appropriate signs are in place at all times.
Signing shall remain in place and be maintained by the contractor, supplemented by additional signs as required, throughout the life of the contract.
Signs placed by the contractor shall not be removed until the contract is completed and the Department’s forces have re-erected standard highway signs along the project. However, it shall be the responsibility of the Department to see that all Departmental signs are in place upon completion and acceptance of the project.
Mr. Holm stated that pursuant to this contract, La. Paving was not responsible *1197 for highway design, depth of asphalt overlay, and striping of road edges. It was required to follow contract specifications and to remedy dangerous situations at the commencement of a job and as needed on a day to day basis. This would include finishing the shoulders even with the edge of the road surface and filling low spots even if the contractor must furnish additional shoulder fill material to accomplish this. He also stated that it is the responsibility of both DOTD and the contractor to determine whether low shoulder signs are needed in an area.
A contractor doing construction work on public highways has the duty to mark, barricade or warn the public of conditions in the construction site which present an unreasonable risk of harm. Carr v. Boh Brothers Construction Company, Inc., 557 So.2d 356 (La.App. 4th Cir.), writs denied, 559 So.2d 1353 (La.1990). La. Paving contractually assumed the duty to maintain the roads and shoulders in a condition sufficient to protect the public. La. Paving breached this duty and the harm which occurred was encompassed by the scope of the risk which the duty was designed to protect. La. Paving knew of the defective shoulder and failed to repair or adequately warn against it. As such, we find the trial court erred in determining that La. Paving had no duty to repair or warn of the defective shoulder. The evidence is overwhelming that La. Paving’s breach of duty was a cause of the damages suffered by Ms. Jenkins. The trial court’s factual conclusions to the contrary are erroneous.
FAULT OF GRAHAM AND LAURIE JENKINS
DOTD contends that the trial court erred in refusing to find that the actions of Laurie Jenkins or alternatively Danny Graham were the cause of the accident; and that in not wearing a safety belt Ms. Jenkins failed to mitigate her damages.
A motorist has the duty to drive prudently which includes the duty to maintain control of his vehicle and to maintain a proper lookout for hazards. Paige v. Commercial Union Ins. Co., 512 So.2d 507 (La.App. 3d Cir.), writ denied, 513 So.2d 823 (La.1987).
There was no evidence to indicate that Graham was driving at an excessive rate of speed or that he was intoxicated when the accident occurred. Graham testified that he was driving within the speed limit (between 45 to 50 miles per hour), and negotiated the curve at 40-45 miles per hour. There was no evidence to the contrary. He was not familiar with the highway, the road was not lighted nor were there any center and edge stripes. His description of how the accident occurred is as follows:
Well, I went around the curve, and — and, you know, I thought the road kept going straight, you know. It looked like that, you know, when you went around the curve, you know, that — that, you know, the road was straight, you know. And so I was, you know, started going straight there, you know, an’ [sic] it was — more of the curve, you know. It was like the curve, you know, went on around. And so I kind of, you know, went like that (indicating), you know. I thought it was straight, an [sic] then when I figured out that it wasn’t straight, well, then I went back that a way (indicating), and that’s when my wheel dropped off, you know. And then I tried to get back on the road, and every time I’d try to go back on the road, you know, well, it kept shifting me and kept kind of throwing me down in the ditch, you know. And so then, you know, I figured well, I couldn’t get — it felt like a hole, or something, you know. And so then I just — it just kept — every time I’d try to go back on it, you know, I could hear the bottom of my, you know, my truck dragging, it sounded like, you know. And so I tried it a couple of times, you know, and I couldn’t get back on the road. So then I just — it just kept throwing me down in the ditch, you know. So then I just — finally just had to follow it, you know, and go down in the ditch, you know. And then I didn’t hit my brakes because if I did, I knew I would either slide into all them pine *1198 trees, you know, or something worse would happen, you know. So I just kinda let it go until I could get, you know, either get back on the road, or stop, you know. And then that’s when I hit that gravel entrance, you know, coming in there, and then it just flipped, you know, just — it just kept — every time I’d try to go back on it, you know, I could hear the bottom of my, you know, my truck dragging, it sounded like, you know. And so I tried it a couple of times, you know, and I couldn’t get back on the road. So then I just — it just kept throwing me back down in the ditch, you know. So then I just — finally just had to follow it, you know and go down in the ditch, you know. And then I didn’t hit my brakes because if I did, I knew that I would either slide into all them pine trees, you know, or something worse would happen, you know. So I just kind of let it go until I could get, you know, either get back on the road or stop, you know. And then that’s when I hit that gravel entrance, you know, coming in there, and then it just flipped, you know.
In written reasons for judgement the trial court found:
“Graham’s vehicle inadvertently dropped off the edge of the roadway on the north side, just past the intersection of Oliver Wheat Road which intersects from the north. When Mr. Graham attempted to re-enter the highway, the right wheel of his small truck hit the road edge preventing him from re-entering the roadway safely. While attempting to slow his vehicle after finding it impossible to safely re-enter the roadway, Mr. Graham struck an unseen dirt driveway leading into the woods on the north side of the highway. His vehicle was thrown into the air and Ms. Jenkins was ejected. Ms. Jenkins suffered injuries rendering her quadriplegic. The testimony and other evidence showed that Mr. Graham acted prudently when faced with dangerous conditions and a sudden emergency. He was not at fault.”
After careful review of the record and given the inherent risks presented by a compound curve which was not adequately marked and signed we cannot say the trial court was manifestly erroneous in finding that Graham’s actions were not the cause of the accident.
DOTD makes much of Graham’s statement given to the investigating State Trooper whereby Graham allegedly stated that Ms. Jenkins was intoxicated, fell across his lap, pinned the steering wheel and forced the vehicle off the road. When questioned regarding this alleged statement Graham stated that he did not “remember telling him like that.” She did not grab the steering wheel or cause the truck to leave the roadway. In a second deposition Graham was queried again regarding Ms. Jenkins’ actions:
Q. Did Laurie ever grab the steering wheel to cause you to run off the road?
A. No.
Q. Did she lay over in your lap?
A. No. You know, it’s kind of hard to say, you know, because, you know, it happened so fast and, you know, and she was getting throwed around so much, you know, because them cars— them trucks is so light, you know. You can just be riding down the road, you know, and they’re light, you know, and a passenger just jumps up and down automatically anyway, you know.
Q. I guess what I’m getting at is: prior to running off the road, did she lay over across the seat or anything?
A. No.
Q. Okay
A. She was in pretty well control of herself, you know, I’d say, through the whole deal.
Q. Okay. Do you recall giving a statement to the officer on the night of the accident?
A. No, I don’t recall giving it to him, you know, but it was kind of a — I didn’t — I couldn’t — at the time I didn’t know what happened, you know, it happened so fast. You know, I was sitting there trying to figure out what happened, *1199 you know, and it was so dark you couldn’t see, you know, so—
Q. Okay. Then you don’t recall telling the officer that Laurie leaned over and grabbed the steering wheel?
A. No.
After careful review of the record we cannot say that the trial court’s determination, that the actions of Mr. Graham and Ms. Jenkins were not a cause of the accident, was manifestly erroneous.
Former La.R.S. 32:295.1(E)(4) (pri- or to its amendment by La.Acts 1988, No. 759 Sec. 1, eff. August 1, 1988) allowed the admission of a plaintiff’s failure to wear a safety belt to mitigate damages when the party offering the evidence proved that use of the safety belt “would have reduced the injured party’s damages in an amount equal to or in excess of the amount of mitigation sought.” Two percent of damages was the maximum allowable amount of reduction.
It is uncontroverted that Graham’s pickup truck was equipped with properly working safety belts and that neither Graham nor Ms. Jenkins was wearing them at the time of the accident.
In written reasons for judgment the trial court found that Ms. Jenkins was ejected from the truck when it was airborne. The trial court also found that DOTD failed to offer evidence “to minimize the plaintiff’s claim for damages.” After careful review of the record we find no manifest error in the trial court’s conclusion therein.
APPORTIONMENT OF FAULT
We have determined that both DOTD and La. Paving are at fault in causing this accident and a de novo apportionment of fault is necessary. Boudreaux, 604 So.2d at 652.
DOTD was negligent in the design of the curve, in failing to adequately sign the curve and in not requiring La. Paving to repair the defective shoulder or adequately warn of the danger. La. Paving was negligent in failing to repair the low shoulder within a reasonable time or to adequately warn motorists of its presence. Thus we apportion 50% fault to DOTD and 50% fault to La. Paving.
INDEMNITY
DOTD contends that the trial court erred in denying DOTD’s indemnity claim against La. Paving.
Section 107.18 of the Gold Book is an indemnity provision by which the contractor agrees to indemnify DOTD for negligent acts of the contractor for which DOTD is liable.
Subsection 107.18 of the Gold Book provides in part:
The contractor shall indemnify the Department, its officers and employees from all suits, actions or claims brought because of injuries or damage sustained by any person or property on account of operations of the contractor; or on account of negligence in safeguarding the work; or through use of unacceptable materials in constructing the work; or because of any negligent act, omission or misconduct or the contractor....
La.R.S. 38:2216 prohibits an indemnity provision in a public contract whereby the public body may be indemnified by the contractor for damages to third parties caused by the negligence of the public body, its agents and employees.
The accident was caused in part by the design and signing of the curve, which was the sole responsibility of DOTD; as well as the failure to repair or maintain the shoulder or adequately warn the public of such which responsibility La. Paving agreed to perform. Given the concurrent negligence of DOTD and La. Paving, DOTD cannot recover in indemnity for damages arising from DOTD’s own negligence. This case is distinguishable from that of Robinson v. State Department of Transportation and Development, 454 So.2d 257 (La.App. 1st Cir.), writ denied, 458 So.2d 122 (La.1984) wherein we held that because the contractor was primarily liable and DOTD secondarily liable the contractor was required to indemnify DOTD for its damages and costs. Additionally, *1200 Robinson was decided prior to the effective date of La.R.S. 38:2216.

La.R.S. 13:5106(B)(1)

DOTD contends that the general damage award of $3,000,000 is in violation of La. R.S. 13:5106(B)(1). That statute limits to $500,000 the total amount recoverable in a personal injury action against the state, exclusive of medical care and related benefits, loss of earnings and loss of future earnings.
The trial court refused to apply La.R.S. 13:5106 reasoning that it is an affirmative defense which was not raised prior to trial.
La.C.C.P. art 1005 enumerates an illustrative list of affirmative defenses. An affirmative defense must be specially pleaded. The reason for such is that an affirmative defense is a defense which will have the effect of defeating the suit on the merits; thus it is required to be specially pleaded in order to give fair and adequate notice of the nature of the defense to avoid surprising plaintiff at trial. The statutory cap is not an affirmative defense because it will not defeat the suit on the merits. Additionally the statutory cap is fixed by statute. Consequently, surprise does not result from the failure to plead the limitation. See Salter v. State Department of Health and Human Resources, 612 So.2d 163 (La.App. 1st Cir.1992). Accordingly, we reduce the general damage award to $500,000.
QUANTUM
a) Future Medical and Life Care Costs
Ms. Jenkins was twenty-five years old at the time of the injury. She has an eighth grade education and no vocational training. Her work history consists of “brief intervals” as a waitress, veterinary assistant and landscaper.
She sustained a cervical fracture at the C5-6 level which resulted in quadriplegia. After extensive hospitalization and rehabilitation she can sit upright in a wheelchair and hold her head up. She has very little neuromuscular control but is able to assist in feeding and has learned to use a joystick controlled power wheelchair. She is totally dependent on her parents for round the clock care, e.g. bowel and bladder care, eating, dressing, bathing, physical therapy and transportation. She will require personal care assistance for daily activities for life and is totally dependent on others for performing household tasks. Her parents take care of her young son.
Dr. Leo P. Blaize, III, an internist who has treated Ms. Jenkins for medical problems related to the quadriplegia, stated that her future medical prognosis is poor. She will have continuous bladder and bowel incontinence, be at increased risk for urinary tract infections, sepsis, respiratory infections, bed sores, muscle spasms, and depression. She will need medical attention in those areas for life. Her life expectancy is an additional 53.9 years.
The medical conditions she must deal with on a daily basis, are as follows: cervical vertebrae C5-C6 fracture dislocation with quadriplegia, posterior cervical fusion with wiring, continued subluxation of C5 on C6, headaches, neurogenic bowel, neuro-genic bladder, mild demineralization of the bone of the pelvis, parotid gland injury, neurogenic vesical dysfunction secondary to spinal cord injury and autonomic dysre-flexia.
Her physical and mental status include: quadriplegia, areflexia, dependent in all activities of daily living, poor sitting balance, unable to stand, unable to cook, unable to perform household chores, unable to drive, unable to transfer independently, unable to perform self-catheterizations, unable to perform bowel program independently, depression, anger, headaches and night sweats.
Dr. Gary S. Risszler, a Physical Medicine and Rehabilitation Specialist at the Rehabilitation Institute of New Orleans treated Ms. Jenkins when she was a patient at that institution. He stated that with optimal medical care she should live a normal life expectancy.
Robert G. Voogt is a Rehabilitation Counselor and Rehabilitation Specialist who evaluates life care plans and costs for persons who have suffered catastrophic in *1201 juries. Mr. Voogt testified that with reasonable medical certainty it is more probable than not that Ms. Jenkins will require specialized care for the remainder of her life. Mr. Voogt prepared a future life care plan tailored to Ms. Jenkins’ needs. The cost of items in Mr. Voogt’s plan is based on information obtained from cost surveys he has conducted in 46 states. Mr. Voogt stated that Ms. Jenkins will require ongoing medical, therapeutic and rehabilitation efforts to enable her to restructure and rebuild her life in such a way that she will have a sense of participation and accomplishment in all important areas of her life. She will require continuing physical and occupational therapy, medical and therapeutic evaluations and treatment, possible vocational training, an adapted living environment and adaptive equipment for mobility. In order for the rehabilitative process to be successful, programs which deal with the following issues are essential; joint range of motion and control of spasticity; skin care program; activities of daily living; home renovations; mobility and transportation. She will also require a variety of support and services: monitoring of her skin condition, regular evaluations and treatment from a psychiatrist, orthopedist, neurosurgeon, neurologist, internal medicine specialist, pulmonologist and urologist. Numerous medical tests will also be needed on a continuing basis: CBC/SMAC tests, CT scans, MRI, electromylegrams, x-rays, renal scans, urine cultures and urinalyses. Additionally, she will need annual therapeutic evaluations in physical, occupational and recreational therapy. She will also need 24 hours per day licensed practical nurse care; monitoring by a registered nurse twice a month; housekeeper and live-in child care services. There is a possibility that she may require future hospitalizations and surgeries due to possible complications which are anticipated with spinal cord injury patients: decubitus ulcers, kidney stones, urinary tract infections, increased upper respiratory illnesses, fractures of extremities and thrombophlebitis. She will also require specialized equipment necessary for lifetime care and medication.
Dr. Randolph Rice, an economist, testified that the present value of the future costs of Ms. Jenkins’ life care and medical expenses is the sum of $8,950,752.00. In arriving at this sum Dr. Rice explained that he used an inflationary element to account for the rising costs of medical and care items, and a discount factor which allows one to earn interest on currently available money. Dr. Rice used an “offset” in these two areas and a 3% net discount factor for the support care costs. DOTD offered no evidence in contradiction of Ms. Jenkins’ claim for future life care costs.
The trial court regarded the $8,950,752 cost as excessive and awarded the sum of $5,000,000. DOTD complains that the sum awarded is excessive and should be reduced to $793,000.
A reviewing court should not set aside an award of quantum unless an analysis of the facts and circumstances reveals that the trial court abused its discretion in setting the award. Reck v. Stevens, 373 So.2d 498 (La.1979). After review of the record we find the award is supported by the record and is not an abuse of discretion.
b) Future Earning Capacity
•[18] Ms. Jenkins stated that for three years prior to the accident she was living with the father of her child and had not worked, other than for occasional part time stints as a waitress, for which she was paid in cash. She had not filed an income tax return in several years. Approximately one month prior to the accident she and her son began living on their own and she was planning to return to work as a waitress in order to support herself. She estimated that she would have earned $300 per week for a forty hour week. The trial court awarded the sum of $75,000 for lost earning capacity. DOTD contends this award should be decreased.
Damages for loss of future earnings or future earning capacity should be based on the injured person’s ability to earn rather than what was actually earned before the injury. Lee v. USAA Casualty Insurance Co., 540 So.2d 1083 (La.App. 1st *1202 Cir.), writs denied, 542 So.2d 514, 515 (La.1989); reversed on other grounds, 571 So.2d 127 (La.1990). After review of the record we find no abuse of the trial court’s discretion in this award.
c) Loss of Consortium
In awarding damages to the minor child for loss of consortium the trial court found that the child had been “almost totally deprived physically and psychologically of his mother”. The child is cared for fully by grandparents and relatives, given the severe extent of his mother’s injuries. The trial court awarded $100,000. DOTD contends this award is excessive. A careful review of the record again does not reveal an abuse of discretion.
DECREE
In accordance with the above we reverse the judgment of the trial court and assess fault at 50 per cent on the part of DOTD and 50 per cent on the part of La. Paving. We reduce all awards by the fifty per cent fault attributed to La. Paving. We amend to reduce the remaining $1,500,000 general damages assessed against DOTD to $500,-000. In all other respects the judgment of the trial court is affirmed. Costs in the amount of $793.50 are assessed against DOTD.
REVERSED IN PART, AMENDED AND AS AMENDED, AFFIRMED.
GONZALES, J., dissents in part and concurs in part and assigns reasons.